**Audrey JACQUES, Plaintiff–Appellee–Cross–Appellant,**

v.

**DIMARZIO, INC., Defendant–Appellant–Cross–Appellee.**

Nos. 03–9080, 03–9109.

United States Court of Appeals,
Second Circuit.

Argued June 11, 2004.

Decided Oct. 5, 2004.

As Amended Oct. 8, 2004.

Gary Ettelman, Ettelman & Hochheiser, Garden City, NY, for Defendant–Appellant–Cross–Appellee.

Tatiana Ingman and Grace Won, Legal Interns, (Donna Lee, on the brief), BLS Legal Services Corporation, Brooklyn, NY, for Plaintiff–Appellee–Cross–Appellant.

Before: WALKER, Chief Judge, JACOBS, Circuit Judge, STANCEU, Judge.*

JACOBS, Circuit Judge.

Defendant DiMarzio, Inc. ("DiMarzio") appeals from judgment entered after a jury trial in the United States District Court for the Eastern District of New York (Block, *J.*) awarding $190,000 in damages to Plaintiff Audrey Jacques, a former DiMarzio employee who alleged that DiMarzio fired her because she was "regarded as" disabled, in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12102(2)(C). Jacques cross-appeals from a ruling that she failed to make out *prima facie* claims under 42 U.S.C. §§ 12102(2)(A) (discrimination against the disabled) and (B) (discrimination against those with a "record" of a disability).

We hold that the district court erred when it instructed the jury that an impairment causing a "perceived" demeanor of (*inter alia*) "hostility" and "social withdrawal" qualifies under the ADA as a "perceived" disability substantially limiting Jacques's ability to "interact with others." We affirm the district court's ruling that Jacques failed to make out *prima facie* claims under either 42 U.S.C. §§ 12102(2)(A) or (B).

**Background**

**I**

DiMarzio is an electric-guitar manufacturer with factory and assembly operations in Staten Island, New York. In 1989, DiMarzio hired Jacques to work in its factory as a packager and assembler of guitar components. Before she was terminated in 1996, DiMarzio received average to above-average employee evaluations. *Jacques v. DiMarzio, Inc.*, 200 F.Supp.2d 151, 154 (E.D.N.Y.2002).

When an appeal comes to us after a jury verdict, we view the facts of the case in the light most favorable to the prevailing party. *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 253 (2d Cir.1991).

Jacques has had psychiatric problems since she began to suffer "severe and major depressions" as a teenager and has been continually treated for these problems on an inpatient and outpatient basis for over forty years. *Jacques*, 200 F.Supp.2d at 154. In December 1991, while in a period of depression, Jacques refused surgical treatment for uterine hemorrhaging. *Id.* As a result, Jacques's work attendance was erratic for several months. *Id.* In 1992, Jacques took a two-week leave of absence to recover from her infection; this was when she first informed the plant manager, Michael Altilio, that she "was suffering from severe depression and a depression disorder" and that she was taking Prozac. Altilio was "very understanding" and indicated that Prozac was "a very good medication." With Jacques's permission, Altilio informed Jacques's immediate supervisor Betty Capotosto, who was considerably less sympathetic; Capotosto told Jacques that, while on leave, she should "get crayons and a coloring book and make pot holders."

In 1993, Jacques was diagnosed by her treating psychiatrist as having a "chronic" form of "Bi-polar II Disorder."[2] Her

* The Honorable Timothy C. Stanceu, Judge, United States Court of International Trade, sitting by designation.

2. This diagnosis was based on the assessment of her treating psychiatrist that Jacques has

"major depressive episodes accompanied by hypomanic episodes," also described as "a chronic pattern of unpredictable mood episodes and fluctuating unreliable interpersonal and/or occupational functioning." According

complaint describes two major depressive episodes after 1992: one following a minor car accident in 1994 and another when her mother became "seriously ill." Jacques indicated that her relations with her co-workers deteriorated after her two-week leave in 1992, though the majority of the instances she offers to support this deterioration are from 1996.[3]

Beginning in early 1996, Jacques complained that factory safety had worsened because of overcrowding and poor ventilation. That March, she sought emergency room treatment for "severe headaches, blurred vision, nasal congestion, and nausea" which she attributed to factory conditions. When she reported this theory to Altilio, he told her she was "giddy" and walked away. Jacques attempted repeatedly and unsuccessfully to get DiMarzio to pay for the emergency room treatment.

From 1990 through 1996, Jacques also repeatedly expressed safety concerns about DiMarzio's practice of allowing factory employees to supplement their income by taking piecework "home" (a practice known at the company as "homework"). She specifically cited "the dangers of solder and flux, glue, fumes, inadequate ventilation, and the absence of safety glasses" when work was performed at home. *Jacques*, 200 F.Supp.2d at 154. Nevertheless, between April and June 1996, Jacques repeatedly asked her superiors for homework to supplement her own income. Capotosto and Altilio always refused, citing Jacques's report of an adverse reaction to solder fumes in March 1996. Capotosto and Altilio also told Jacques that they did not trust her to do the work safely at home without supervision. In August 1996, Jacques again confronted Altilio about the dangers of homework and argued that the practice violated New York safety laws. Altilio rebuffed her concerns.

By August 1996, Jacques's working relationship with Altilio and Capotosto had become poisonous, as all three attested. According to Altilio, Capotosto "was no longer really able to effectively do her job because" she felt obliged "to tiptoe around [Jacques] and not say something wrong to get [Jacques] upset and cause a whole scene." Altilio, concluding that Jacques's presence at the DiMarzio factory had become counterproductive, nevertheless resolved to "keep" Jacques and "maintain [her] income" by giving her a job as an "outside subcontractor" working off the plant's premises. To this end, on August 30, 1996, Altilio informed Jacques that, because of her "ongoing conflicts with other workers" he wanted her to perform her guitar assembly work exclusively at home. *Jacques*, 200 F.Supp.2d at 155. Altilio testified that Jacques expressed interest in this proposal, but Jacques testified that

to Jacques's psychiatrist, "mood swings, irritability, apathy, poor judgment, and denial" that she "cannot regularly control" are symptomatic of this condition. When Jacques "is in a hypomanic episode, her thoughts will be racing and she does not view her behavior as pathological. However, others may easily be troubled by her erratic behavior patterns." Her psychiatrist indicated that her condition "made her vulnerable in social interactions such that she would react in unpredictable ways" and he recommended that she work in a "structured, well-defined environment . . . with her own semi-closed space such as a cubicle would provide." The psychiatrist also attributed her refusal to have surgery in 1991 to her bipolar condition. *Jacques*, 200 F.Supp.2d at 154.

3. As to pre–1996 period: Jacques testified that, at some point in the "early '90s," she was questioning Altilio "about some kind of work" and Altilio responded by shaking his head and calling Jacques "nuts." This was the only time, according to Jacques, that Altilio called her "nuts" or any other synonym for mental impairment.

her perception of the offer was that "if I didn't take this proposal, I wouldn't have a job." On September 3, 1996, Altilio asked Jacques if she would accept his proposal, subject to the conditions that there would be "no more conflicts" with coworkers and that she "could not hold [DiMarzio] liable if [she] was injured at home." Jacques indicated that she first wanted to consult with a lawyer.

On September 5, 1996, before Altilio or Jacques could agree on the terms of an independent contractor arrangement, Altilio indicated that one of Jacques's coworkers, Leandra Mangin, had lodged a complaint against her for "harassment": Mangin had received a phone call at work from one of her children, and when Jacques answered the phone she allegedly announced that the call was for "that b* * * * "—a comment that the child overheard. According to Altilio, this was the latest in a series of harassing comments that Jacques had made to Mangin. Jacques acknowledged that she frequently teased and ridiculed Mangin but insists that this behavior was "girl-talk and not harassment." Following the harassment complaint, Jacques called in sick for the next two workdays because she was "too upset to leave [her] house and expose [herself] to the anxieties of the workplace."

Over the next few days, Jacques and Altilio discussed her situation (in person and by phone) several times; on one occasion Altilio said Jacques "should see a psychiatrist." Finally, on September 11, 1996, Altilio told Jacques that she could return to work, but should "leave if [she]

felt upset and [should] avoid ... Mangin." Altilio also said that he would continue to investigate the possibility of allowing her to work at home. Later that day, he called Jacques back and informed her that he had spoken with Larry DiMarzio, the owner of the company, who had rejected the idea of allowing Jacques to work at home and instead instructed Altilio to terminate Jacques based on her "numerous conflicts with supervisors and ... coworkers."

## II

On October 23, 1996, Jacques filed a *pro se* complaint against DiMarzio with the National Labor Relations Board ("NLRB"), alleging that she had been discharged in violation of the National Labor Relations Act ("NLRA"). *Jacques*, 200 F.Supp.2d at 155. In response, DiMarzio provided the NLRB with a written statement from Altilio and Capotosto that described Jacques as a "technically competent and productive worker" whose "only technical shortcoming" was a need for "explicit, detailed directions on how to continue her work" whenever anything "unexpected" happened.

This statement went on to describe Jacques as a "problem employee": she was prone to "[c]onfrontations with co-workers, ... intolerance of·[ethnic minorities in the] production department,[4] [and][e]motional problems in dealing with supervisory staff"; she was the "most confrontational person we have ever employed"; her supervisors and coworkers felt obliged to treat her with "kid gloves." The state-

---

**4.** Although DiMarzio stated that Jacques "never made open and overt racial or ethnic slurs directly to her co-workers," it cited several incidents where it claimed Jacques showed signs of ethnic prejudice towards her Hispanic–American coworkers (she once allegedly said of one of her Hispanic coworkers that "you can't understand a word she says") and her African–American coworkers (she once allegedly told Capotosto—in reference to her African–American coworkers—"Why don't you just hire two more Monkeys to replace me?").

ment further explained that Mr. DiMarzio, in firing Jacques, "saw no reason why his supervisory staff should be forced to make such an extreme effort to tiptoe around and cater to someone who was emotionally unstable." Summarized supporting statements by eight of Jacques plant coworkers (in addition to Altilio and Capotosto) suggested—at the very least—that her coworkers and supervisors found Jacques to be intimidating and mercurial.

The NLRB found no violation of the NLRA and dismissed the complaint. *Jacques*, 200 F.Supp.2d at 155. After failing to win relief in a claim before the New York State Division of Human Rights, Jacques sought and received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") and commenced this action under the ADA and state law.

In a Memorandum and Order dated February 27, 2002, the district court (Block, *J.*) granted summary judgment dismissing two of Jacques's claims: [1] her claim under 42 U.S.C. § 12102(2)(A) that she was discriminated against because of an impairment (bipolar disorder) that substantially impaired her ability to take care of herself and [2] her claim under 42 U.S.C. § 12102(2)(B) that she was discriminated against because of her "record" of an impairment (bipolar disorder) that substantially impaired her ability to take care of herself or work. *Id.* at 156–59. The court declined to dismiss Jacques's claim under 42 U.S.C. § 12102(2)(C), ruling that there was a "triable issue of fact as to whether DiMarzio regarded Jacques as having 'severe problems' 'on a regular basis' in her 'relations with others.'" *Id.* at

161. The district court also denied summary judgment on Jacques's claim under New York state's whistleblower statute.[5] *Id.* at 162.

At the end of trial, DiMarzio moved under Fed.R.Civ.P. 50(a) for judgment as a matter of law. The trial judge reserved decision on the motion. Shortly thereafter, the judge stated that "there's enough ... for the case to go forward." Under the charge given, the jury found that DiMarzio terminated Jacques because it "perceived" her as being disabled in the major life activity of "interacting with others" and awarded her $50,000 in compensatory damages and punitive damages. The court subsequently awarded an additional $140,000, representing all claims to back pay, front pay, pre-judgment interest and post-judgment interest.

### Discussion

■ The *prima facie* elements of an ADA claim are:

(1) plaintiff's employer is subject to the ADA;

(2) plaintiff was disabled within the meaning of the ADA;

(3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and

(4) plaintiff suffered [an] adverse employment action because of her disability.

*Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir.2003). Each element must be established for an ADA plaintiff to prevail at trial.[6]

---

5. The whistleblower claim under N.Y. Lab. Law § 215 was based on Jacques's claim that she was fired in part as retaliation for her complaints about safety practices at DiMarzio. This claim was rejected by the jury and is not a subject of this appeal.

6. DiMarzio conceded in the proceedings below that it is a covered entity under the ADA. *Jacques*, 200 F.Supp.2d at 156.

"[I]ndividuals with 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual'" are disabled within the meaning of the ADA. *Felix v. N.Y. City Transit Auth.*, 324 F.3d 102, 104 (2d Cir.2003) (quoting 42 U.S.C. § 12102(2)(A)). A plaintiff is also "disabled" within the meaning of the ADA if she has a "record" of such an impairment. 42 U.S.C. § 12102(2)(B). Finally, a plaintiff is "considered 'disabled' under the ADA if she is 'regarded as' suffering from a physical or mental impairment that 'substantially limits one or more of the major life activities,' even if she does not actually suffer from such an impairment." *Cameron*, 335 F.3d at 63 (quoting 42 U.S.C. § 12102(2)(A) & (C)).

## I

■ DiMarzio argues on appeal that the district court erred in denying its motion for summary judgment on Jacques's claim that she "was regarded ... as having a mental disability that substantially limited her ability to interact with others." *Jacques*, 200 F.Supp.2d at 159 (citations and internal quotation marks omitted). However, the post-trial appeal of a denial of summary judgment "will not ordinarily lie" because "[t]he district court's judgment on the verdict after a full trial on the merits ... supersedes the earlier summary judgment proceedings." *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 130 (2d Cir.1999).

■ Although DiMarzio made a pre-verdict motion for judgment as a matter of law based on insufficiency of the evidence under Fed.R.Civ.P. 50(a), it failed to make a post-verdict motion as required by Fed. R.Civ.P. 50(b). In *Pahuta*, we made clear that

> [i]n the absence of a Rule 50(b) renewed motion or extraordinary circumstances,

an "appellate court [i]s without power to direct the District Court to enter judgment contrary to the one it had permitted to stand." The purpose of requiring a renewed motion for judgment as a matter of law is to give the opposing party "'an opportunity to cure the defects in proof that might otherwise preclude him [or her] from taking the case to the jury.'"

*Id.* at 129 (citations omitted). The failure to make a motion under Fed.R.Civ.P. 50(b) is one that this Court will excuse only in very narrow circumstances. As we said in *Pahuta:*

> Failure to comply with Rule 50(b) may be excused only when the district court has indicated that the motion need not be renewed, and the party opposing the motion could not reasonably have thought "that the movant's 'initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of [such] judgment ....'"

> We may overlook such a default in order to "'prevent a manifest injustice' in cases '[w]here a jury's verdict is wholly without legal support.'"

*Id.* (citations omitted).

■ DiMarzio does not seriously urge us to overlook its failure to move under Rule 50(b) and we are not inclined to do so. We perceive no "manifest injustice" to be prevented nor is the jury verdict "wholly without legal support." True, the trial judge stated that "I reserved on everything. Whether I will allow [the verdict] to stand or not, I will deal with that in the future and give everybody an opportunity to address the issue"; but the trial judge also reminded DiMarzio's counsel to be "mindful" that "as far as any post-verdict motions, you are to comply with the Federal Rules of [P]rocedure." Notwithstand-

ing this caution, DiMarzio concedes that no Rule 50(b) motion was made. Because of this failure and the lack of circumstances excusing it, we decline to address the sufficiency of the evidence to support the jury verdict favoring Jacques on her ADA claim—at least in the form that DiMarzio now raises it.

## II

█ Alternatively, DiMarzio argues that the district court committed numerous reversible errors when it instructed the jury on the claim that Jacques was terminated by DiMarzio because it "perceived" her as being disabled in the major life activity of "interacting with others." This Court "review[s] a district court's jury instruction *de novo* to determine whether the jury was misled about the correct legal standard or was otherwise inadequately informed of controlling law. A new trial is required if, considering the instruction as a whole, the cited errors were not harmless, but in fact prejudiced the objecting party." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir.2001) (citations and internal quotation marks omitted). DiMarzio's attacks on the jury instructions are several but at oral argument it focused on the following passage:

> Relevant to this case, a person is considered "disabled" under the Disabilities Act if she is regarded or perceived as having a mental impairment that substantially limits a major life activity. *The ability to interact with others is a major life activity.* Jacques must prove that she was perceived as *having relations with others* that were *character-*

*ized on a regular basis by severe problems, such as consistently high levels of hostility, social withdrawal, or failure to communicate when necessary,* all due to her mental impairment. It is a perception case, in other words. Merely cantankerous persons are not deemed substantially limited in their major life activity of interacting with others. It has to be more than that.

(Emphasis added). Although DiMarzio represented to this Court its "belief" that it objected to this portion of the jury instructions, it conceded in a post-argument letter to this Court that it is "unable to locate a specific objection to the charge." Letter from Appellant at 1 (June 11, 2004). We too find no objection preserved in the appellate record.

█ Under the version of Fed. R.Civ.P. 51 in effect at the time of trial in this case, "no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict." [7] Thus, a failure to make a timely objection to a disputed jury instruction ordinarily constitutes a waiver of appellate review of the instruction. However, it is also well settled that the purpose of Fed. R.Civ.P. 51 is "to allow the trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate," *Fogarty v. Near North Ins. Brokerage, Inc.*, 162 F.3d 74, 79 (2d Cir.1998), not to multiply redundant motions:

> Rule 51 must be read in conjunction with Fed.R.Civ.P. 46, which states that "[f]ormal exceptions to rulings or orders

7. Fed.R.Civ.P. 51 was amended, effective December 1, 2003, to provide, *inter alia*, that a party's failure to object to a jury instruction does not constitute a forfeiture of the objection if the party previously made its position clear in a "proper request" for jury instructions filed with the court, and the court de-nied that request "in a definitive ruling on the record." Fed.R.Civ.P. 51(d)(1)(B). This change, had it been in effect at the time of trial, would not have helped DiMarzio because a "proper request" for an instruction was never made.

of the court are unnecessary," as long as a party makes known its objection and the basis for it at the time the district court rules. As such, a failure to object after a charge is given is excused where . . . a party makes its position clear . . . and the trial judge is not persuaded. *Girden*, 262 F.3d at 202.

Here, the district court was made fully aware of DiMarzio's position that "interacting with others" was not a major life activity under the ADA. DiMarzio so argued in its summary judgment motion (as well as elsewhere) and the trial judge discussed and explicitly rejected DiMarzio's position in its written opinion on the motion. *See Jacques*, 200 F.Supp.2d at 160–61; *see also Dresser Indus., Inc. v. The Gradall Co.*, 965 F.2d 1442, 1450 (7th Cir. 1992) (holding that defendant had not waived objection to the jury charge by failing to make a Rule 51 motion because it had "devot[ed] three pages . . . in its memorandum opposing" plaintiff's summary judgment motion to the issue and therefore "had reason to believe that it would be pointless to press its theory further"). Because DiMarzio's position on the validity of this disputed jury instruction was explicitly considered and rejected by the district court in its decision denying summary judgment, we conclude that the issue is not waived on appeal. We are therefore obliged to review the legal soundness of the district court's instructions to the jury on whether Jacques was "regarded as" disabled within the meaning of the ADA.

### III

To prevail under the "regarded as" provision of the ADA, a plaintiff must show more than "that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA.*"

*Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir.1998). This Court follows "a three-step process for determining whether a plaintiff has a disability" that is protected by the ADA. *Id.* at 641; *accord Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). We consider: (1) "whether the plaintiff suffered from a physical or mental impairment," (2) whether " 'the life activity' upon which the plaintiff relied . . . constitutes a major life activity under the ADA," and (3) whether "the plaintiff's impairment 'substantially limited' [the] major life activity identified." *Colwell*, 158 F.3d at 641 (citations omitted). Since DiMarzio concedes that Jacques's bipolar disorder is a "mental impairment" for purposes of the ADA, Appellant's Brief at 23, our review narrows to the remaining issues under *Colwell, i.e.* whether "interacting with others" is a major life activity protected under the ADA and, if so, what showing is necessary for a plaintiff to be considered "substantially limited" in "interacting with others."

In *Cameron* we expressly declined to address the question of whether "interacting with others" was a major life activity under the ADA and observed that the issue had fractured the circuits. *See* 335 F.3d at 63–64. In the first case to address the issue, the First Circuit suggested that "the ability to get along with others" is never a major life activity under the ADA, observing that such an ability comes and goes, "triggered by vicissitudes of life which are normally stressful for ordinary people," and that "[t]o impose legally enforceable duties on an employer based on such an amorphous concept would be problematic." *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997). Two years later, the Ninth Circuit concluded otherwise, describing "interacting with others" as "an essential, regular function,

like walking and breathing" that "easily falls within the definition of 'major life activity'" under the ADA. *McAlindin v. County of San Diego,* 192 F.3d 1226, 1234 (9th Cir.1999), *cert. denied,* 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000). *But see id.* at 1240 (Trott, J., dissenting) ("Not only is this 'disability' vague, but it's bizarre, ominous, and wholly outside of the group of serious disabilities Congress intended to cover with this statute."). All other circuits faced with the issue have (sometimes with exertion) avoided deciding whether "interacting with others" is a major life activity under the ADA.[8]

The parties urge us to align ourselves with either the First Circuit's reasoning in *Soileau* or the Ninth Circuit's holding in *McAlindin.* We decline to subscribe to either analysis.

There is a difference between "get[ting] along with others" (the life activity considered in *Soileau* ) and "interacting with others" (the life activity considered in *McAlindin* ). We agree with the First Circuit's observation that "get[ting] along with others" is an unworkably subjective definition of a "major life activity" under the ADA— in much the same way that "perceiving" (as distinct from merely "seeing" or "hearing") would be an unworkably subjective "major life activity." *See Soileau,* 105 F.3d at 15. However, it is difficult to contradict the Ninth Circuit's characteriza-

tion of "interacting with others" as "an essential, regular function" that "easily falls within the definition of 'major life activity.'" *McAlindin,* 192 F.3d at 1234. We also think that "interacting with others," as overarching as it may be, more objectively describes a life activity than does "getting along with others," which connotes proficiency or success and worsens the problem of subjectivity that concerned the First Circuit. *Cf. McAlindin,* 192 F.3d at 1235 ("trouble *getting along* with coworkers is not sufficient to show a substantial limitation" under the ADA). Although "interacting with others" is a more inclusive activity than (say) "seeing" or "standing," similarly overarching "major life activities" have been endorsed by all of the current members of the Supreme Court in one case or another. *See, e.g., Bragdon,* 524 U.S. at 638–39, 659, 665, 118 S.Ct. 2196 (acknowledging "caring for one's self" as a valid "major life activity" under the ADA).

While we accept the Ninth Circuit's premise that "interacting with others" is a "major life activity" under the ADA, we conclude that the Ninth Circuit's test for determining when a limitation on this activity is "substantial" for ADA purposes is unworkable, unbounded, and useless as guidance to employers, employees, judges, and juries. According to the Ninth Circuit—whose opinion in *McAlindin* the dis-

---

**8.** *See Rohan v. Networks Presentations LLC,* 375 F.3d 266, 274 (4th Cir.2004) ("We decline to resolve this issue here because, assuming that interacting with others is a major life activity, [plaintiff] has not demonstrated that it is an activity in which she is substantially limited."); *MX Group, Inc. v. City of Covington,* 293 F.3d 326, 337 (6th Cir.2002) (noting "that it has been held that 'interacting with others,' is a major life activity" but declining to decide the issue); *Heisler v. Metro. Council,* 339 F.3d 622, 628 (8th Cir.2003)(declining to hold that "interacting with others [is] a separate major life activity" because

plaintiff failed to provide evidence that her mental impairment "substantially limited her ability to interact with others"); *Steele v. Thiokol Corp.,* 241 F.3d 1248, 1254–55 (10th Cir.2001) (declining to address whether interacting with others is a major life activity because plaintiff was not substantially limited in her ability to interact with others); *see also Emerson v. Northern States Power Co.,* 256 F.3d 506, 511 (7th Cir.2001) (describing "interacting with others" in apparent dicta as one of many "activities that feed into the major life activities of learning and working").

trict court's jury instructions in this case tracked—a plaintiff's impairment in "interacting with others" is "substantial" for purposes of the ADA when it is "characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary," *McAlindin*, 192 F.3d at 1235, so that a mere "cantankerous[ness]," is not enough. *Id.*

The Ninth Circuit's presumed demarcation—between persons who are "hostile" and those who are "cantankerous"—does not exist. The "cantankerous" are those "marked by ill humor, irritability, and determination to disagree." *Webster's New International Dictionary* 328 (3d ed.1986). On the same hand, the most relevant definition of "hostile" is: "marked by antagonism or unfriendliness." *Id.* at 1094. It does not help much to require that the hostility be of a "consistently high level" or that the disability in interacting with others be otherwise "severe." Common personality traits such as hostility and argumentativeness are useful professional traits in many employment contexts. And traits associated with Jacques's impairment, such as apathy and poor judgment, *see infra* note 2, are (equally) useless indicia of whether a deficit in human relations is a "substantial" limitation. In a similar vein, the Ninth Circuit's phrase, "consistently high levels of . . . social withdrawal," fails to capture the appropriate standard.[9]

The Ninth Circuit approach also frustrates the maintenance of a civil workplace environment. The more troublesome and nasty the employee, the greater the risk of litigation costs for an employer that disciplines or fires him. All things being equal, a "cantankerous" person or a curmudgeon would be more secure by becoming more unpleasant. And an employer faced with an employee who is (for example) an outspoken bigot or boor would have to choose between the risk of litigating that employee's ADA claim, or the risk of litigating the claims of others who experience an unchecked hostile work environment as a result of that employee's behavior.[10]

■ We return to the distinction between "getting along with others" (a normative or evaluative concept) and "interacting with others" (which is essentially mechanical). We hold that a plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people—at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful. A plaintiff who otherwise can perform the functions of a job with (or without) reasonable accommodation could satisfy this standard by demonstrating isolation resulting from any of a number of severe conditions, including acute or pro-

---

9. "Social withdrawal" (even a high level of it) has an array of meanings, not all of which amount to a substantial limitation on a person's ability to interact with others. The range of personality includes people who are reclusive, or laconic, or acerbic. Some people choose to be alone. Others are isolated for other reasons. *See, e.g., United States v.*

*Gementera*, 379 F.3d 596, 606 (9th Cir.2004) (apparently using the term as a synonym for, or a consequence of, "stigmatization" by others).

10. Evidence in the record suggests that Jacques, on multiple occasions, used language in the workplace that was racist.

found cases of: autism, agoraphobia, depression or other conditions that we need not try to anticipate today.

 Based on our conclusion regarding the proper standard to be applied, as discussed above, we conclude that the district court erred in the way it instructed the jury on the showing necessary to establish that Jacques was "regarded as" having a disability substantially limiting her in "interacting with others." *See Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994) ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."). The next question is whether this error was "harmless." *See Girden,* 262 F.3d at 203 ("A new trial is required if, considering the instruction as a whole, the cited errors were not harmless, but in fact prejudiced the objecting party."). We think there is little doubt that DiMarzio was prejudiced by the erroneous jury instruction and that the error was not harmless. Indeed, the district court, in denying DiMarzio's summary judgment motion on Jacques's "regarded as" claim, stated that "DiMarzio perceived Jacques ... as an 'extremely emotional' and 'irrational' individual." *Jacques,* 200 F.Supp.2d at 161. This characterization falls far short of the correct standard for showing that Jacques was "regarded as" being "substantially limited" in "interacting with others." The judgment must be vacated and the case remanded for additional proceedings consistent with this opinion. *See Pahuta,* 170 F.3d at 129 ("[i]n the absence of a Rule 50(b) renewed motion ... an 'appellate court is without power to direct the District Court to enter judgment contrary to the one it had permitted to stand'") (citations omitted). Nothing in this opinion inhibits the parties from entering a renewed motion in district court for summary judgment premised on the legal principles herein.

## IV

 The district court ruled that Jacques failed to make out a *prima facie* claim under 42 U.S.C. § 12102(2)(A) that she was terminated solely on the basis of an impairment (bipolar disorder) that substantially impaired her ability to take care of herself, which is a major life activity within the meaning of the ADA. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 871–72 (2d Cir.1998); *accord Bragdon,* 524 U.S. at 638–39, 118 S.Ct. 2196. Although the district court conceded that Jacques's bipolar disorder constituted an "impairment" for purposes of the ADA, it ruled that the "severity and duration" of her disorder did not substantially limit Jacques in the "major life activity" of "caring for oneself." *Jacques,* 200 F.Supp.2d at 157–58. The district court observed that

> This conclusion is reinforced by Jacques's deposition testimony that her mental condition did not affect her ability to take care of her home, to have a normal social life, or to attend to her personal hygiene.

*Id.* at 158. The court acknowledged that Jacques had attempted to neutralize this deposition with medical testimony that she "tends to minimize her symptoms," but ruled that Jacques could not "create a material issue of fact by submitting an affidavit disputing [her] own testimony." *Id.* (internal quotation omitted). On cross-appeal, Jacques challenges the grant of summary judgment in favor of DiMarzio.

 We review dismissal of a claim on summary judgment *de novo. See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998). In doing so, we construe the evidence in the light most favorable to Jacques (as the non-moving party) and draw all reasonable inferences in her fa-

vor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Maguire v. Citicorp Retail Servs., Inc.,* 147 F.3d 232, 235 (2d Cir.1998). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Jacques's argument focuses almost exclusively on the district court's (tangential) observation that she "attempt[ed] to create an issue of fact by arguing that her deposition testimony is not credible" as though that were the sole ground for the ruling. Jacques ignores numerous findings that the symptoms associated with her bipolar disorder had not "substantially limited" her ability to "take care of herself." *Jacques,* 200 F.Supp.2d at 158. We find no basis to disturb the district court's grant of summary judgment to DiMarzio on this claim.

We have considered the parties' remaining arguments on appeal, including DiMarzio's appeal of a variety of evidentiary and procedural rulings by the district court, and Jacques's appeal from the award of summary judgment to DiMarzio on her claim under 42 U.S.C. §§ 12102(2)(B). None of these claims has merit.

\* \* \*

For the foregoing reasons, the judgment of the district court is VACATED and RE-MANDED in part, and AFFIRMED in part.