16-1318-cv
*Woods v. START Treatment & Recovery Ctrs.*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2016

Argued: February 23, 2017
Decided: July 19, 2017

Docket No. 16-1318-cv

CASSANDRA WOODS,

*Plaintiff-Appellant*,

TINA HINTON,

*Plaintiff*,

—v.—

START TREATMENT & RECOVERY CENTERS, INC.,

*Defendant-Appellee*,

ADDICTION RESEARCH AND TREATMENT CORPORATION,

*Defendant*.

Appeal from the United States District Court
for the Eastern District of New York
No. 13-cv-4719 – Ann M. Donnelly, *Judge*.

Before:

KEARSE, HALL, and CHIN, *Circuit Judges*.

Plaintiff Cassandra Woods lost a jury trial on claims that she was fired for exercising her rights under the Family and Medical Leave Act. Her appeal presents two principal questions. First, what is the appropriate causation standard for FMLA retaliation claims? Second, was Woods unduly prejudiced by the admission of adverse inferences based on her invocation of the Fifth Amendment at her deposition?

The district court (Ann M. Donnelly, *Judge*) instructed the jury that it must apply "but for" causation to Woods's claims and that it was permitted to infer that Woods would have answered "yes" to the relevant questions at her deposition. We hold that FMLA retaliation claims of the sort Woods brings in this case require a "motivating factor" causation standard and that Woods was unduly prejudiced by the admission of adverse inferences.

VACATED AND REMANDED.

ABDUL K. HASSAN, Queens Village, New York, *for Plaintiff-Appellant*.

DAVID M. POHL, New York, New York, *for Defendant-Appellee*.

RACHEL GOLDBERG, Senior Attorney (M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, William C. Lesser, Deputy Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, *on the brief*), *for* R. Alexander Acosta, United States Secretary of Labor, Washington, D.C., as *amicus curiae* in support of Plaintiff-Appellant.

HALL, *Circuit Judge*:

If a jury finds against Woods, but it was wrongly instructed on the law, can its verdict still stand? In this case, our answer is no.

Plaintiff-Appellant Cassandra Woods appeals a final judgment of the United States District Court for the Eastern District of New York (Ann M.

Donnelly, *Judge*) following a jury trial in which Woods lost on all of her claims under the Family and Medical Leave Act ("FMLA"). Woods was fired from her job at START Treatment and Recovery Centers ("START") in 2012. She says that she was terminated in retaliation for taking leave under the FMLA; START says it was because of her poor performance. The jury appears to have agreed with START.

Woods lodges two main arguments on appeal. First, she contends that the district court wrongly instructed the jury that "but for" causation applies to FMLA retaliation claims. Second, Woods argues that she suffered impermissible prejudice when the district court allowed the jury to draw adverse inferences based on her invocation of the Fifth Amendment at her deposition. We agree on both counts. Accordingly, the judgment of the district court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

**I**

Because Woods appeals a jury verdict in favor of START, we view the facts in the light most favorable to START. *See Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 77 (2d Cir. 2006); *see also Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 195 (2d Cir. 2004) (applying this standard even where the district court provided improper jury instruction).

START is a nonprofit that operates eight clinics providing treatment services to about 3,000 narcotic-addicted patients each day. Cassandra Woods

3

began work as a substance abuse counselor at START's "Kaleidoscope" Clinic in 2007, and her tenure ended on May 18, 2012. The reason for her departure is the subject of this suit.

In her role as a substance abuse counselor, Woods was responsible for counseling around fifty patients, usually in thirty-minute sessions. After each such session, START counselors spend fifteen minutes or so writing a patient "note," which is important for START both to maintain its state certification and to bill Medicaid and other insurance companies. In 2011, START implemented a new, state-mandated note system known as "APG." APG is more complex than the prior note-keeping method, and many counselors struggled to adapt; fifteen percent of counselors were terminated for failing to comply with APG requirements.

Woods also struggled with APG. Although her July 2010 and July 2011 performance reviews were generally satisfactory, START's assessment of her took a turn for the worse in March 2011. START determined that Woods was failing to achieve "required outcomes" in "compliance" and "documentation." J. App'x 874. START offered Woods "enhanced training." *Id.*

Enhanced training, however, did not seem to do the trick. Woods received warning memos documenting performance issues in April and June 2011. In August 2011, Woods appeared to right the ship, and she received a pay raise for her efforts, but thereafter her performance again began to slip. She received three more warning memos in November 2011, December 2011,

4

and February 2012. The February 2012 memo recorded that Woods had a twenty-eight percent completion rate for her notes. The typical completion rate among other counselors was ninety to ninety-five percent. By March 2012, Woods was put on ninety-day probation for "her on-going failure to perform [her] job duties as directed and/or within designated time frames despite verbal and/or written warnings." J. App'x 879–80.

Probation did not appear to have remedied Woods's performance issues either. Her deadline for catching up on a backlog of patient notes was extended by memo twice—on April 4, 2012 and April 18, 2012. On May 10, 2012, Rodney Julian, Clinical Director at the Kaleidoscope Clinic and Woods's direct supervisor, recommended terminating Woods to Dr. Robert Sage, the Senior Vice President for the Division of Human Services. Dr. Sage fired Woods on May 17, 2012, citing Woods's failure to maintain up-to-date patient notes and "on-going failure to perform [her] job duties." J. App'x 889.

Woods tells a different story about the reason for her termination. She suffers from severe anemia and other conditions and on several occasions requested medical leave under the FMLA. The exercise of her FMLA rights, in Woods's view, is why START fired her. Woods's account begins in February 2011, when she approached Madeleine Miller, an employee in START's human resources department, and requested FMLA leave. Shortly thereafter, Woods cancelled the request. Woods says that she did so because Rodney Julian asked her to; Julian denies that such a conversation ever took place.

In August 2011, Woods was hospitalized for six days while being treated for her anemia. Although START does not appear to have given Woods a full explication of her FMLA rights, it did acknowledge that the hospitalization period was protected. Some months later, while Woods was on probation, she again attempted to take FMLA leave. According to Woods's version of the encounter, she was told that because she was on probation, she could not take FMLA leave. Renee Sumpter, the human resources contact to whom Woods made the request, says that she told Woods no such thing. The next day, Woods visited her doctor but declined hospitalization because she was afraid of losing her job. START did nothing at that time.

In April 2012, still while Woods was on probation, she was hospitalized for another seven days. START acknowledges that this time too was protected under the FMLA. Woods returned to work on April 28, 2012. Twelve days later, Julian recommended firing Woods, and she was terminated a week later.

Woods sued, bringing claims for, *inter alia*, interference and retaliation under the FMLA. In discovery, Woods sat for a deposition. She was asked about a prior incident in which she was accused of some wrongdoing. In relevant part, Woods was asked a series of questions about whether she had been accused of criminal conduct, of lying, of fabrication, and of fraud. *See* J. App'x 53–54. Woods invoked her Fifth Amendment right against self-incrimination in response to each of questions.

After the close of discovery, the district court ruled on a number of pre-trial matters. START filed a motion *in limine* seeking an adverse inference instruction based on Woods's invocation of the Fifth Amendment in response to several questions asked during her deposition. Woods opposed the motion, arguing that the deposition questions were hearsay, not reflective of credibility, and inadmissible under the Federal Rules of Evidence. The district court granted START's motion, ruling that the jurors would be permitted to presume that Woods would have answered the deposition questions in the affirmative. The district court noted that Woods had preserved her objections. J. App'x 89.

The district court also resolved START's motion for a ruling on whether Woods was required to show that the exercise of her FMLA rights was the "but for" cause of her termination in order to prevail on the retaliation claim. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, No. 13-cv-4719, 2016 WL 590458 (E.D.N.Y. Feb. 11, 2016). After analyzing the FMLA's text and Supreme Court precedent, the district court concluded that Woods did indeed need to demonstrate that her FMLA leave was the "but for" cause of her termination, rather than a mere "motivating factor" in the decision, as Woods had argued. *Id.* at *2 (emphases omitted). The parties were instructed to submit proposed jury instructions that comported with the district court's rulings.

At trial, START put on evidence of Woods invoking the Fifth Amendment. During Woods's cross-examination, defense counsel reviewed the deposition transcript with Woods, reading each of the pertinent questions and Woods's responses. *See* J. App'x 333–38.[1] Woods confirmed the accuracy of the deposition transcript and acknowledged that she had asserted the Fifth Amendment in response to the questions. Based on that evidence, the district court gave the following instruction to the jury at the close of evidence:

> The plaintiff invoked her Fifth Amendment right against self-incrimination, which she was permitted to do in this case. However, from the plaintiff's invocation of the Fifth Amendment, you may draw certain conclusions but are not required to do so. Specifically, you may infer that the plaintiff's answers at her deposition, if she had not refused to answer, would have been "yes" to the questions asked, if she had not invoked the Fifth Amendment. You may, but are not required to, draw these inferences against the plaintiff when you are evaluating her credibility, and you can give these inferences whatever weight that you wish or, if you choose to give it no weight, you can do that.

J. App'x 642–43.

The district court also instructed the jury on the ultimate questions before it. One of those questions was whether START retaliated against Woods

---

[1] For example, defense counsel asked Woods: "do you have knowledge of a City of New York investigation concerning you that was being conducted in or about October of 2011?" J. App'x 334. Woods invoked the Fifth Amendment. About that same investigation, defense counsel asked more questions, such as: "In that case were you accused of some kind of immoral conduct?" *Id.* at 335. "[W]ere you accused of lying." *Id.* "[W]ere you accused of fabricating events?" *Id.* at 336. "[W]ere you accused of submitted false documentation?" *Id.* "[W]ere you accused of misrepresenting facts to the government?" *Id.* at 337. "[W]ere you accused of fraud." *Id.* To all these questions, Woods invoked the Fifth Amendment.

for exercising her rights under the FMLA. On the retaliation issue, the district court gave the following instruction:

> To succeed on her claim of retaliation, the plaintiff must prove by a preponderance of the evidence that the defendant terminated her for taking FMLA leave. For you to determine that the plaintiff was terminated for taking FMLA leave, she must prove that the defendant would not have terminated her if she had not taken FMLA leave, but everything else had been the same.
>
> The defendant has given nondiscriminatory reasons for its decision to terminate the plaintiff. The FMLA does not protect an employee from performance problems caused by the conditions for which the FMLA leave is taken. Under the FMLA, a person can be fired for poor performance, even if that poor performance is due to the same root cause as the need for the leave. To put that another way, if an employee's work performance problems are related to the same elements that gave rise to the FMLA leave, then the employee can still be terminated based on her work performance problems regardless of the indirect causal link between the FMLA leave and the decision to terminate the employee.
>
> If the plaintiff has proved by a preponderance of the evidence that the defendant's explanations for the termination are a pretext or an excuse for discrimination, you must find that the defendant violated the FMLA.

J. App'x 652–53.

After all of the evidence was submitted and the district court instructed the jury on the applicable law, the jury deliberated for a short time and returned a complete defense verdict. Woods timely appealed.

9

## II

Woods first challenges the district court's jury instruction on the appropriate causation standard to be applied to her FMLA retaliation claims, that is, how the jury was to assess the role, if any, that Woods's exercise of FMLA rights played in START's decision to fire her. As it did below, START argues that Woods must prove that her exercise of FMLA rights was the "but for" cause of her termination. Woods counters that she must only show that her FMLA leave was used as a "negative factor" in START's decision to fire her.

"We review a claim of error in the district court's jury instructions *de novo*, disturbing the district court's judgment only if the appellant shows that the error was prejudicial in light of the charge as a whole." *Sheng v. M&TBank Corp.*, 848 F.3d 78, 86 (2d Cir. 2017) (quoting *Turley v. IFG Lackawanna, Inc.*, 774 F.3d 140, 152–53 (2d Cir. 2014)). Jury instructions that mislead the jury as to the correct legal standard are erroneous, but we will not require a new trial unless the instructions, read as a whole, fail to "present[] the issues to the jury in a fair and evenhanded manner." *Id.* (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012)).

The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, provides broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family. An employee has the right to return to the position she held before taking leave, or to an

"equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(B). The FMLA also "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (internal quotation marks omitted).

FMLA claims come in at least two varieties: interference and retaliation. *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004) (per curiam). In a general sense, an employee brings an "interference" claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). "Retaliation" claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. *See Potenza*, 365 F.3d at 168. The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

The first issue in this case presents two distinct, but related, legal questions that have yet to be resolved in this Circuit. First, in which provision of the FMLA are retaliation claims rooted? Second, what quantum of causation must a plaintiff prove between the exercise of FMLA rights and the

11

adverse employment action to hold an employer liable for retaliation? Our answer to the first question informs our answer to the second. We hold that FMLA retaliation claims of the sort Woods brings in this case are grounded in 29 U.S.C. § 2615(a)(1) and a "motivating factor" causation standard applies to those claims.

## A

There is little question that given its broad salutary intent, the FMLA prohibits retaliation against employees who attempt to exercise their rights under the statute. Which statutory provision creates that protection against retaliation, however, is a subject of some dispute in the circuits.

Two possible statutory sources could support FMLA retaliation claims. The first contender is 29 U.S.C. § 2615(a)(1), which provides:

> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

Second is the following provision, § 2615(a)(2), which provides:

> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

The First Circuit finds a basis for FMLA retaliation claims in § 2615(a)(1). *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 n.4 (1st Cir. 1998) (concluding that retaliation for exercising FMLA rights "can be read into § 2615(a)(1): to discriminate against an employee for exercising his

12

rights under the Act would constitute an 'interfer[ence] with' and a 're-strain[t]' of his exercise of those rights"); *see also Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st Cir. 2005) ("The term 'interference' may, depending on the facts, cover both retaliation claims . . . and non-retaliation claims . . . .") (internal citation omitted). The Sixth Circuit assumes that § 2615(a)(2) provides the source for retaliation claims. *See Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 400–02 (6th Cir. 2008). Other circuits point to a Department of Labor regulation, *see Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (citing 29 C.F.R. 825.220(c)), and yet others look to a combination of all three, *see Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332, 334 (5th Cir. 2005).

We have in the past suggested that retaliation claims fall under § 2615(a)(2). *See Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). In *Millea* we observed that:

> The FMLA's anti-retaliation provision has the same underlying purpose as Title VII—and almost identical wording. *Compare* 29 U.S.C. § 2615(a)(2) . . . *with* 42 U.S.C. § 2000e-3(a).

*Id.* The underlying question in *Millea*, however, was unrelated to the statutory source of FMLA retaliation claims. Instead, we decided there that the standard for "materially adverse action" under Title VII (first announced in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)) applies to FMLA claims. *See* 658 F.3d at 164. Because the core question did not involve making a specific determination concerning the well from which

13

FMLA retaliation claims spring, we do not read *Millea*'s passing reference to § 2615(a)(2) as controlling.

We now hold that FMLA retaliation claims like Woods's, *i.e.* terminations for exercising FMLA rights by, for example, taking legitimate FMLA leave, are actionable under § 2615(a)(1). The plain language of § 2615(a)(1) supports this conclusion. Firing an employee for having exercised her rights under the FMLA is certainly "interfere[nce]" with or "restrain[t]" of those rights. Indeed, FMLA rights have two parts—the right to take leave and the right to reinstatement, so terminating an employee who has taken leave is itself an outright denial of FMLA rights.

That this sort of retaliation claim falls under § 2615(a)(1) is also consistent with the statutory text of § 2615(a)(2). Section 2615(a)(2) prohibits adverse employment actions—"discharg[ing] or in any other manner discriminat[ing]"—against employees "for opposing any practice made unlawful by this subchapter." Being fired for *taking* FMLA leave cannot easily be described as "opposing any practice made unlawful" by the FMLA. Instead, that adverse employment action in the face of a lawful exercise of FMLA rights fits comfortably within § 2615(a)(1)'s "interfere with, restrain, or deny" language.

Labor Department rules also support this interpretation of the statute. The Department revised its rule at 29 C.F.R. 825.220(c) "to clarify that the prohibition against interference includes a prohibition against retaliation as

14

well as a prohibition against discrimination." The Family and Medical Leave Act of 1993, 73 Fed. Reg. at 67,934, 67,986 (Nov. 17, 2008). The Labor Department further explained that "[a]lthough section 2615(a)(2) of the Act also may be read to bar retaliation, . . . the Department believes that section 2615(a)(1) provides a clearer statutory basis for § 825.220(c)'s prohibition of discrimination and retaliation" for exercising FMLA rights. *Id.* We agree.

**B**

Woods's FMLA retaliation claim being actionable under § 2615(a)(1), the question becomes whether the district court correctly instructed the jury that it must apply a "but for" causation standard in determining whether START was liable for such retaliation. We conclude that the given instruction was erroneous.

In determining that a "but for" causation standard applied, the district court conducted a thorough analysis of the statutory language in § 2615(a)(2). *Woods v. START Treatment & Recovery Ctrs., Inc.*, No. 13-cv-4719, 2016 WL 590458, at *2–3 (E.D.N.Y. Feb. 11, 2016). Specifically, the district court concluded that § 2615(a)(2) contained language indicating Congress's intent to create such a standard, especially in light of the Supreme Court's analogous analyses in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) and *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). We need not decide whether the district court correctly determined the causation standard for

claims under § 2615(a)(2), however, because, as we explained above, retaliation claims like Woods's are instead rooted in § 2615(a)(1).

START's argument on the appropriate causation standard largely tracks the district court's analysis. It contends that the FMLA lacks "motivating factor" language and thus, under *Nassar*, the default "but for" causation standard applies. Woods, and the Department of Labor as *amicus*, on the other hand, urge us to give *Chevron* deference to the Department's regulation at 29 C.F.R. 825.220(c), which they say compels a lesser causation standard. That regulation provides:

> The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, *employers cannot use the taking of FMLA leave as a negative factor in employment actions*, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies.

29 C.F.R. 825.220(c) (emphasis added).

*Chevron* deference is appropriate where Congress has delegated authority to an administrative agency to make rules carrying the force of law and that agency's interpretation to which deference is to be given was promulgated in the exercise of that authority. Here, Congress delegated to the Secretary of Labor authority to "prescribe such regulations as are necessary to

16

carry out" the FMLA. 29 U.S.C. § 2654. The 825.220(c) regulation was promulgated pursuant to that delegation of authority.

The first step of the *Chevron* analysis is determining whether the statute is ambiguous or silent on the specific question at issue. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). Section 2615(a)(1) is silent as to any test for causation. It makes no mention of a motivating factor test, and unlike the statutes in *Nassar* and *Gross*, it lacks any indicia of Congress's intent to create "but for" causation—words like "because" or "by reason of." While the Supreme Court has said that Congress must indicate when it intends to depart from the default tort rule of "but for" causation, *see Nassar*, 133 S. Ct. at 2525, Congress has chosen to remain silent on the causation issue in § 2615(a)(1) and has instead delegated a statutory gap-filling function to the Secretary of Labor. Indeed, "express congressional authorizations to engage in the process of rulemaking" is "a very good indicator of delegation meriting *Chevron* treatment." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). We thus proceed to *Chevron* step two.

At step two, we ask whether the Labor Department's interpretation of the statute is reasonable—both as a matter of statutory construction and as a matter of policy. *See Chevron*, 467 U.S. at 843–44. It is as to both.

As for statutory interpretation, so long as the Labor Department's interpretation is reasonable, we defer to it "whether or not it is the only possible interpretation or even the one a court might think best." *Holder v. Mar-*

*tinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012); *see Mugalli v. Ashcroft*, 258 F.3d 52, 55 (2d Cir. 2001) ("[I]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation . . . .") (quoting *Michel v. INS*, 206 F.3d 253, 263 (2d Cir. 2010)). Given the sweeping scope of § 2615(a)(1)'s prohibition—"It shall be unlawful . . . to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right"—and the absence of *any* indication of a causation standard, the Labor Department reasonably construed § 2615(a)(1) to prohibit using the exercise of FMLA rights at all in making employment decisions.

The Labor Department's interpretation is reasonable as a matter of policy. The rule was promulgated after notice-and-comment rulemaking, and it comports with the FMLA's broad salutary purposes—namely, "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; [and] . . . to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(1)–(2). The rule is neither arbitrary nor capricious. Instead, it reflects the well-reasoned judgment of the executive officer charged with enforcing the rights granted to this country's employees.

Accordingly, we defer to the Labor Department's regulation implementing a "negative factor" causation standard for FMLA retaliation claims. The district court erred by instructing the jury otherwise.

## C

An erroneous jury instruction, however, does not necessarily entitle Woods to a new trial. "A jury verdict will be reversed only when an appellant can show that the instructions considered as a whole prejudiced [her]." *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998). "[T]he party asserting error has the burden of demonstrating prejudice . . . ." *Renz v. Grey Advert.*, 135 F.3d 217, 223 (2d Cir. 1997) (internal quotation marks omitted). "An error is harmless only if the court is convinced that [it] did not influence the jury's verdict." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

In *Renz*, we held that the district court's erroneous failure to give a motivating factor instruction—and instead requiring but for causation under the Age Discrimination in Employment Act ("ADEA")—"did not prejudice the plaintiff." 135 F.3d at 223. We did so there because the evidence of the plaintiff's poor performance was so overwhelming "that a correct charge on the plaintiff's standard of proof in her ADEA claim would not have made a difference to the verdict." *Id.* at 224. We cannot say the same here.

Although there is evidence from which a reasonable jury could conclude that Woods's deficient performance served as the sole basis for her ter-

19

mination, we are unable to conclude that that evidence is so overwhelming as to render the erroneous instruction harmless. That error, coupled with the erroneous admission of the adverse inferences against Woods described below, resulted in impermissible prejudice.

### III

We next consider Woods's challenge to the admission of adverse inferences based on her invocation of the Fifth Amendment privilege against self-incrimination in her deposition. We review for abuse of discretion the district court's admission into evidence of a witness's invocation of the Fifth Amendment, *Abascal v. Fleckenstein*, 820 F.3d 561, 564 (2d Cir. 2016), and we review *de novo* the related jury instructions, *United States v. Ford*, 435 F.3d 204, 209 (2d Cir. 2006). In evaluating whether the admission of certain evidence was erroneous, we consider the following relevant factors: "(1) whether the evidence bore on the most important issues in the case; (2) whether the evidence was simply cumulative or corroborative; (3) whether the evidence was used in summation; and (4) whether the appellee's case was particularly strong." *Abascal*, 820 F.3d at 567. The admission of the adverse inferences here resulted in prejudicial error.

The district court gave the following instruction as part of its final charge to the jury:

> [F]rom the plaintiff's invocation of the Fifth Amendment, you may draw certain conclusions but are not required to do so. Specifically, you may infer that the plaintiff's answers at her deposition, if

20

she had not refused to answer, would have been "yes" to the questions asked, if she had not invoked the Fifth Amendment. You may, but are not required to, draw these inferences against the plaintiff when you are evaluating her credibility, and you can give these inferences whatever weight that you wish or, if you choose to give it no weight, you can do that.

J. App'x 642–43. The instruction accurately states the law insofar as "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Such adverse inferences are appropriately admitted, however, only if they are relevant, reliable, and not unduly prejudicial. *See Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983). We conclude that the district court exceeded the bounds of its discretion in admitting and permitting the adverse inferences to be drawn here.

First, most of the questions in Woods's deposition were merely whether Woods had been accused of something. Even assuming her answers would have been "yes," accusations have little, if any, probative value because the innocent and guilty alike can be accused of wrongdoing. Without more, accusations do not "impeach the integrity or impair the credibility of a witness." *Michelson v. United States*, 335 U.S. 469, 482 (1948). Thus, Woods suffered acute prejudice from the admission of adverse inferences based on her answers to those deposition questions and from the court's related instructions.

21

Second, Woods suffered even harsher prejudice from the admission of an adverse inference based on her invocation of the Fifth Amendment in response to being asked whether she was ever convicted of any immoral or unethical conduct. Federal Rule of Evidence 609(a)(2) permits the admission of a conviction only when the crime is a felony or the court "can readily determine that establishing the elements of the crime" required proving a "dishonest act or false statement." The district court here failed to consider whether the requirements of Rule 609(a) were met. The results of a Rule 609(a) analysis are especially important in this case because the record is unclear as to what, if any, crime Woods was convicted of. Indeed, there was only a reference to "disorderly conduct," which is not necessarily "dishonest," much less "immoral" or "unethical." An adverse inference based upon Woods declining to answer that deposition question is of questionable probative value on the issue of her credibility.

Third, the danger of unfair prejudice is high when a jury is told that a witness declined to answer a question by invoking the Fifth Amendment; the implication is, at best, that the witness refused to answer because she had something to hide. We tolerate some danger of prejudice from such inferences in civil cases, unless it substantially outweighs the probative value of those inferences. *See Brink's Inc.*, 717 F.2d at 710. Here, the way in which Woods's Fifth Amendment invocation was raised and later argued at closing elevated the prejudice to an intolerable level. Woods's Fifth Amendment invocation

22

was repeatedly emphasized—defense counsel raised it during Woods's cross-examination, the district court instructed the jury on it, and defense counsel argued it during his summation. Although defense counsel attempted to moderate this line of argument, *see* J. App'x 632 ("I am not hanging my hat on [the] Fifth Amendment invocation."), he did so only after forcefully highlighting the inferences that the jury was permitted to draw. In arguing that the entire case hinged on Woods's credibility, defense counsel told the jury "you are permitted in this case to infer that Ms. Woods was the subject of a government grand jury investigation, was accused of fraud, lying, fabricating events, and misrepresenting facts to the government and was then convicted of a crime." *Id.* Defense counsel's statement was consistent with the district court's instruction, but the inferences that the jury was permitted to draw did not necessarily mean anything with respect to Woods's credibility or character for truthfulness.

Apart from allowing such vigorous argument on this point, the district court erred by failing to engage in the required Rule 403 analysis. *See Brink's, Inc.*, 717 F.2d at 710. In our view, the unfair prejudice Woods suffered substantially outweighed the minimal, if not immaterial, probative value of Woods's Fifth Amendment invocation. Accordingly, it was error for the district court to admit those invocations into evidence and to instruct the jury as to what it was allowed to infer from them.

23

## IV

We have considered Woods's remaining arguments and find them to be without merit. Nevertheless, the incorrect jury instruction on the causation standard for Woods's FMLA retaliation claim and the admission of adverse inferences based on Woods's invocation of her Fifth Amendment privilege during the course of her deposition generated prejudicial error. Accordingly, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings not inconsistent with this opinion.