# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 10, 2008         Decided July 1, 2008

No. 07-5139

MARTIN DESMOND,
APPELLANT

v.

MICHAEL B. MUKASEY,
U.S. ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE,
AND
FEDERAL BUREAU OF INVESTIGATION,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01729)

*Lisa J. Banks* argued the cause for appellant. With her on the briefs were *Debra S. Katz* and *Daniel B. Edelman*.

*Marina Utgoff Braswell*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence* and *Jane M. Lyons*, Assistant U.S. Attorneys.

Before: GINSBURG, RANDOLPH, and TATEL, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Rehabilitation Act of 1973 prohibits federal agencies from discriminating in employment on the basis of disability, defined in part as "a physical or mental impairment which substantially limits one or more . . . major life activities." 29 U.S.C. § 705(20)(B)(i). In this case, after being dismissed from the FBI Academy, appellant sued the Attorney General under the Rehabilitation Act, alleging that the FBI discriminated and retaliated against him because of his post-traumatic stress disorder, a mental impairment that substantially limited him in the major life activity of sleeping. The district court granted summary judgment to the government on the discrimination claim, holding that appellant had failed to demonstrate a substantial limitation in sleep, and that even if he had done so, he had failed to show that the FBI's reasons for dismissing him were pretextual. Reviewing the matter de novo, we hold that (1) sleeping is a major life activity for purposes of the Rehabilitation Act; (2) appellant has adduced enough evidence to allow a reasonable jury to find that he was substantially limited in that basic human function; and (3) by vigorously disputing the FBI's professed reasons for his dismissal, appellant has created a genuine issue of material fact regarding the credibility of the FBI's explanation for its decision, rendering summary judgment on the pretext question improper. As for appellant's retaliation claim, which survived summary judgment and was rejected by a jury, appellant challenges the admission of a certain document into evidence and the wording of jury instructions. We reject the former challenge, finding no abuse of discretion by the district court, and the latter, finding any error—if error there was—harmless.

3

**I.**

Because the district court resolved appellant's disability claim on summary judgment in favor of the FBI, we view the evidence in the light most favorable to him, drawing all reasonable inferences in appellant's favor. *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002). Seen through that lens, the record, consisting of affidavits and deposition testimony, tells the following story.

Pursuing a long-held ambition, appellant Martin Desmond, an Ohio native, applied for a position as an FBI special agent in December 1996. With his application pending, Desmond accepted a job as a financial assistant in the Bureau's Cleveland office, a clerical position he viewed as a stepping stone toward his ultimate goal: becoming a special agent. After Desmond passed the necessary placement tests, the FBI offered him an appointment as a special agent, and he joined the FBI Academy's New Agent Training Unit at Quantico, Virginia, in February 2000. Upon accepting this appointment, Desmond acknowledged, as must all trainees, that he could be assigned to any FBI field office within the Bureau's jurisdiction, and that "no transfer [would] be made from one station to another for personal reasons." Letter from Martin Desmond to Director, Federal Bureau of Investigation (Feb. 13, 2000). Desmond also understood that in addition to academic performance, new agent trainees are continually assessed for "suitability," which takes six factors into account: conscientiousness, cooperativeness, emotional maturity, initiative, integrity and honesty, and judgment.

Although Desmond performed well in all his classes, he struggled to deal with the aftermath of a traumatic incident that occurred two years before he entered the Academy. In December 1997, Desmond, then twenty-four years old, was alone in his mother's house when an armed robber, later

revealed to be the so-called Tommy Hilfiger rapist, forced his way inside and held Desmond at gunpoint for a harrowing one-hour ordeal. The intruder led Desmond around the house looking for valuables, repeatedly threatening to kill him and then return to rape his mother. Desmond managed to escape, alert the police, and ultimately help bring the perpetrator to justice. According to Desmond, apart from intensifying his desire to pursue a career in law enforcement, this event caused him to "suffer[] from extreme anxiety, nightmares, sleeplessness, and extreme worry" for his mother's safety. Desmond Decl. ¶ 11.

Driven by fear for his mother's well-being and guilt at having left her side, Desmond repeatedly tried to secure a post-training assignment to the FBI's Cleveland Division. He went about this in a number of ways. He submitted standard "wish lists" of his geographic preferences, ranking Cleveland first out of fifty-six options. Following FBI officials' advice, he filed hardship transfer requests explaining the armed robbery incident and his consequent desire to care for his mother. *See* Letter from Martin Desmond to FBI Transfer Policy Unit (Feb. 29, 2000); Letter from Martin Desmond to FBI Transfer Policy Unit (May 17, 2000). He twice inquired about a recently adopted "support-to-agent" initiative that returned to their home divisions newly minted special agents who, like Desmond, had previously worked for the FBI in a support capacity, but was twice told the initiative would not apply to him. He occasionally contacted FBI Transfer Unit employee John Jacobs, whom Desmond knew from his time in the Cleveland office and considered a friend, to follow up on various ways he might obtain a Cleveland assignment.

None of these efforts proved successful, and on "orders night"—an evening in mid-June when soon-to-be agents received their geographic assignments—Desmond learned

that he would be sent to the FBI's Chicago field office, which he had ranked sixth out of the fifty-six possible posts on his wish list. According to the FBI, upon receiving his orders, Desmond appeared visibly upset and withdrew from the evening's festivities, declining to attend an optional pizza party held for the trainees. Denying he sulked over his orders, Desmond says that upon receiving the Chicago assignment, he "immediately and unexpectedly experienced a wave of fear, anxiety, and guilt related to [his] concerns about [his] mother and [his] responsibility to care for her." Desmond Decl. ¶ 45. The orders, Desmond claims, exacerbated the sleeplessness he had been experiencing since the 1997 armed robbery. In testimony critical to his disability claim, Desmond said: "Prior to the issuance of orders, I was sleeping an average of three to five hours per night. Once orders were issued, I began to sleep only two to four hours each night. Until I returned to Ohio on a permanent basis, I was unable to sleep more than four hours each night, and frequently received only two or three hours of sleep." *Id.* ¶ 48.

During the two months following orders night, Desmond resumed his efforts to obtain a transfer to a location closer to his mother: he asked his staff counselor, Supervising Special Agent James Cochran, to check on the status of his hardship transfer request; he sought placement on the Cleveland waiting list; he asked if he could fill a recent vacancy that had arisen in Pittsburgh, Pennsylvania, a location closer to home than Chicago. Cochran followed-up on these requests, none of which proved successful, but, according to Desmond, never said the inquiries were out of line or violated FBI procedure. In July 2000, Desmond had a mid-course interview with a staff counselor. He received no criticism about his performance or attitude, and the interview form concludes, "Chicago assignment remains an issue, although

 . . . Desmond has accepted the reality of it." Mid-Course Interview Form (July 10, 2000).

In early August 2000, about a month before Desmond's scheduled graduation from the FBI Academy, the nine-year-old child of a family friend succumbed to leukemia, and Desmond requested and received leave to attend the funeral. Around this time, in what Cochran assured Desmond would be an "off the record" conversation, Desmond told Cochran about his friend's child's death as well as his general concerns regarding his mother's health and safety. Desmond Decl. ¶ 54; Desmond Dep. 125-26. While reassuring Desmond that he was performing well at the Academy and was on track to graduate at the end of the month, Cochran suggested that Desmond take advantage of the Employee Assistance Program (EAP), a counseling service for FBI staff.

After returning from the funeral, Desmond took Cochran's advice and met with EAP counselor Tom Lewis. Lewis told Desmond that he was showing signs of post-traumatic stress disorder (PTSD) and encouraged him to use writing to work through his stress. Specifically, Lewis suggested that Desmond write letters as a way to vent his feelings.

The following week, on August 14, 2000, Desmond and Cochran had another conversation, the nature of which the parties dispute. According to Desmond, Cochran asked him to share details from his EAP meeting, even though such counseling sessions were supposed to be confidential. Feeling "obliged" to answer his supervisor's questions, he explained what he and Lewis had discussed. Desmond Decl. ¶ 58. When he mentioned PTSD, Desmond recalls, Cochran "abruptly cut me off[,] . . . told me that he was not supposed to ask about my communications with the EAP and quickly

walked away." *Id.* Cochran's memory differs: he expressly denies Desmond's claim that a PTSD diagnosis came up during that August 14 meeting, asserting that the first he heard of PTSD was in September, after Desmond had already been denied permission to graduate. *See* Cochran Dep. 126-28. By Desmond's account, however, the August 14 meeting constituted a turning point in his relationship with Cochran. After the meeting, Desmond asserts, Cochran's behavior "changed drastically," with Cochran actively avoiding him, treating him in a "dismissive" or "hostile" manner, and criticizing him for various alleged infractions. Desmond Decl. ¶ 59.

After his meeting with Cochran, Desmond's fortunes at the FBI took a turn for the worse. On August 25—four days before graduation—Desmond and Cochran had a tense conversation about Desmond's Chicago assignment. Upset over this interaction, Desmond drafted a letter, printed it out, and placed it on his desk. In the letter—styled as a formal resignation, dated for graduation day, and addressed to the Director of the FBI—Desmond railed against the "deceit and lies [he] ha[d] been told" during his FBI employment, observed that "the supervisors and management leave a lot to be desired," and complained that the FBI refused to accommodate his "family issues" and "personal matters" by transferring him back to Cleveland. Draft Letter from Martin Desmond to FBI Director Freeh (Aug. 29, 2000).

Cochran found the letter later that day, though the parties dispute how he came upon it: Desmond claims it was hidden from view and that Cochran must have rummaged through his belongings to find it, while Cochran testified in his deposition that it was face-up and only partially covered when it caught his eye. *Compare* Desmond Decl. ¶ 67 ("I had placed the letter under a stack of other papers, a computer disk, and

writing implements, where it could not be seen."), *with* Cochran Dep. 174-75 ("I could see a portion of this resignation letter."). In any event, record evidence reveals that other trainees knew about the letter, and rumors were circulating that Desmond planned to present it to FBI Director Freeh during the graduation ceremony. *See* Carpenter Depo. 54-56; Davis Dep. 140; Wulbert Dep. 56-57.

Needless to say, Desmond's letter was hardly well received by FBI officials. When Cochran called Desmond out of class to discuss the matter, Desmond explained that he had no real intention of resigning, and—following the EAP counselor's advice—had written the letter merely "to vent his anger." Appellant's Opening Br. 6. Cochran, now joined by Unit Chief Roger Trott, told Desmond that his graduation status was in doubt given his apparently shaky commitment to the FBI. The two supervisors told Desmond to write a retraction, and although they set no time or page limit, Desmond returned in twenty minutes with a two paragraph letter apologizing for his "family issues" and stating that he was in fact "committed to becoming a Special Agent of the FBI." Letter from Martin Desmond to FBI Director Freeh (Aug. 25, 2000). Three days after their meeting with Desmond—the day before graduation—Cochran and Trott met with their supervisor, Section Chief John Louden, and briefed him on the situation. Those officials decided that Desmond would not graduate with his class the following day and that Cochran would instead perform a "suitability investigation" into Desmond's behavior. According to the FBI, this decision was "[b]ased on the contradictions between the two letters drafted close in time to one another." Appellees' Br. 8. According to Desmond, however, the FBI officials had "seized upon the letter to provide a rationale to try to remove Desmond from the FBI Academy based on their biased concerns about PTSD." Appellant's Opening Br. 6.

After reaching their decision, Cochran and Trott broke the news to Desmond that he would not graduate on August 29. During this conversation, Trott also instructed Desmond to see Dr. Nancy Davis, the chief EAP psychologist, and Desmond promptly did so. Dr. Davis confirmed that Desmond suffered from PTSD, but assured Desmond that the condition was treatable and that she thought he would make a fine special agent. Desmond signed a release allowing Dr. Davis and another EAP counselor, Steve Spruill, to discuss the contents of the session with Trott. According to Trott, Dr. Davis said that Desmond's actions "may be caused by trauma," but Trott did not recall whether she used the term "post-traumatic stress disorder." Roger Trott Dep. 145-46. In her deposition testimony, however, Dr. Davis said, "I know that I told [Trott] he was—that I thought he was having some of the PTSD." Davis Dep. 73-74.

Meanwhile, Cochran conducted the suitability inquiry, compiling a document that would come to be known as the "Cochran report." In preparing this report and its accompanying memorandum, Cochran interviewed several of Desmond's instructors and classmates, and included Desmond's answers to ten written questions relating to his behavior and commitment to the FBI. *See* Memorandum from James Cochran to Jeffrey Higginbotham (Sept. 18, 2000). The document described several instances of actual or perceived misconduct, ranging from alleged dress-code infractions to failures to follow proper procedures to Desmond's allegedly lax work habits during his temporary job at the Academy switchboard. The report also mentioned Desmond's inability "to remain levelheaded and effective under the stress associated with his transfer," citing inappropriate questions, remarks, and "frequent and often unexplained crying episodes." *Id.* at 10-11. According to Desmond, much of the information in the Cochran report was

"false, incomplete, or exaggerated." Appellant's Opening Br. 7.

Accurate or not, the report proceeded up the chain of command to Assistant Director of Training Jeffrey Higginbotham. After reviewing the document, Higginbotham composed a September 28 memorandum to his superiors recommending that Desmond be dismissed as a new agent trainee and reassigned as clerical support staff. *See* Memorandum from Jeffrey Higginbotham to William Welby (Sept. 28, 2000). Recounting many of the same incidents mentioned in the Cochran report, Higginbotham's memo stated that Desmond never quite accepted his Chicago assignment, that he was unwilling to accept an outcome with which he disagreed, and that he engaged in "a months' long episode of immature behavior, the catalyst of which was his transfer from the Cleveland Division to the Chicago Division." *Id.* at 6. The memo concluded that Desmond lacked the appropriate levels of cooperativeness and emotional maturity required of a special agent. Neither Cochran's nor Higginbotham's memorandum mentioned Desmond's PTSD diagnosis.

About a week later, Trott and Cochran told Desmond that Higginbotham would recommend dismissal. The next day, Desmond met with Higginbotham for the first time and asked him to reconsider. Pleading his case, Desmond argued that the Cochran report was inaccurate, incomplete, and misleading. Higginbotham replied that he had yet to send his September 28 memorandum to FBI headquarters, indicating that if he received any contrary information about Desmond he would take it into account and consider withdrawing his recommendation. Desmond had several classmates, instructors, and others contact Higginbotham to vouch for his positive characteristics. For example, one former classmate

emailed Higginbotham to say, "never during the course of those 16 weeks did I feel that [Desmond] had a poor attitude toward the job or that it would be inappropriate for [him] to be in a law enforcement position." Email from William B. Shute to Jeffrey Higginbotham (Oct. 4, 2000). Echoing these views, another classmate told Higginbotham, "[Desmond] is solid, he was an excellent student and, in my opinion, will make an outstanding Special Agent. In the highest compliment to any law enforcement officer, I wouldn't think twice about going through a door with him or asking him to back me up in any field scenario." Email from Kera E. Wulbert to Jeffrey Higginbotham (Oct. 4, 2000).

Facing a filing deadline, Desmond submitted a formal Equal Employment Opportunity (EEO) complaint a week after his meeting with Higginbotham, claiming the FBI had discriminated against him on the basis of a mental handicap. Shortly thereafter, EAP counselor Dr. Davis met with Higginbotham, and according to her deposition testimony, she agreed that Higginbotham harbored concerns that "Desmond continued to suffer from some sort of psychological impairment that might affect his abilities going forward," testifying that she "would have said that [Desmond] was in post-traumatic stress disorder." Davis Dep. 144, 79. Higginbotham's account of that conversation differs. "[A]lmost assuredly," he said, "I do not ever recall her using that technical phrase, which would have been an important trigger for me . . . [b]ecause it would have perhaps suggested a confirmable diagnosable disability." Higginbotham Dep. 145. It is uncontested, however, that Dr. Davis told Higginbotham that she thought Desmond could overcome his trauma and become a good agent.

Higginbotham sent his memo, along with the Cochran report, further up the chain of command to Deputy

Administrator Michael Varnum, who had ultimate authority to terminate new agents. Higginbotham's submission, however, included no reference to Dr. Davis's PTSD diagnosis.

On October 23, Desmond and Higginbotham met for a second time. According to Desmond, Higginbotham made a comment that forms the crux of his retaliation claim—that "he would have let [Desmond] graduate if [he] had not filed an EEO complaint." Desmond Decl. ¶ 121. Higginbotham did not recall making any such statement.

After reviewing the documents and recommendations before him, Varnum drafted a letter dated November 6 dismissing Desmond for failure to meet the suitability requirements of emotional maturity and cooperativeness. The letter emphasized "the manner in which [Desmond] dealt with [his] first-office assignment," and referenced many of the same incidents included in the Cochran report, such as Desmond's sulking manner, his allegedly poor work ethic, a failure to report a traffic citation, and the episode involving his putative letter of resignation. Letter from Michael Varnum to Martin Desmond 2 (Nov. 6, 2000). "Most important," Varnum concluded, "your superiors and I are concerned about your safety and ability to deal with difficult and potentially dangerous situations that you will confront as an Agent in the field." *Id.* at 2-3.

On November 14, 2000, Louden and Trott presented Desmond with Varnum's dismissal letter. Although the letter offered Desmond the option of returning to his old support position in Cleveland, Desmond chose instead to resign that same day. After exhausting his administrative remedies, Desmond filed suit in federal district court, alleging unlawful discrimination and retaliation under the Rehabilitation Act.

Based on Higginbotham's disputed statement that he would have let Desmond graduate were it not for his EEO complaint, the district court allowed Desmond's retaliation claim to proceed to a jury, which ultimately ruled against him. But the court granted summary judgment to the government on the disability claim, holding that Desmond had failed to demonstrate that he was either actually disabled or regarded as such by the FBI for purposes of the Rehabilitation Act. Although the district court could have stopped there, having found that Desmond failed at the threshold of the analysis, it went on to find that he had also failed to show that the FBI's "articulated reasons for terminating [him] were pretextual." *Desmond v. Gonzales*, No. 03-1729, slip op. at 46 (D.D.C. Jan. 17, 2006) ("Mem. Op."). Desmond now appeals the district court's grant of summary judgment to the FBI on his disability claim, as well as two trial-related decisions by the district court. We consider each challenge in turn, beginning with the primary issue before us: Desmond's disability claim.

## II.

The Rehabilitation Act bars federal agencies from discriminating against employees with disabilities. *See* 29 U.S.C. § 791(b); *Taylor v. Rice*, 451 F.3d 898, 905 (D.C. Cir. 2006) (explaining that Rehabilitation Act section 501(b) provides aggrieved employees with a private right of action against federal agencies for claims alleging employment discrimination). When assessing "nonaffirmative action employment discrimination" claims like Desmond's, we adopt the same standards used to determine liability under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12111 *et seq. See* 29 U.S.C. § 791(g); *Taylor*, 451 F.3d at 905 (applying ADA employment discrimination standards in Rehabilitation Act case). To withstand summary judgment on his disability discrimination claim, Desmond must produce enough evidence to allow a reasonable jury to conclude that

he (1) has a disability; (2) was qualified to perform the essential functions of employment with or without reasonable accommodation; and (3) suffered an adverse employment decision due to his disability. *See Duncan v. WMATA*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc).

Not all individuals having what might commonly be perceived as physical or mental disabilities are protected by the Act. As used in the Act, the term "disability" means "a physical or mental impairment which substantially limits one or more . . . major life activities." 29 U.S.C. § 705(20)(B)(i). In other words, as the Supreme Court has made clear, "[m]erely having an impairment does not make one disabled for purposes of the [Act]. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). The Act also extends coverage to individuals having "a record of such an impairment" as well as those "regarded as having such an impairment." 29 U.S.C. § 705(20)(B)(ii)-(iii). Here Desmond argues that he fits under the first and third of these definitions, arguing that his PTSD substantially limited his ability to sleep, rendering him actually disabled, and that the FBI "regarded" him as substantially limited in the major life activities of interacting with others and working.

We begin with Desmond's claim of actual disability. Under that definition, "a plaintiff is disabled under the [Act] if: (1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial." *Haynes v. Williams*, 392 F.3d 478, 481-82 (D.C. Cir. 2004). Here the government never disputes that PTSD qualifies as a "mental impairment." *Cf. Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998) (recognizing PTSD as an impairment). The question before us, then, is whether

Desmond's PTSD substantially limited a major life activity. Desmond contends that it did, arguing that it limited his ability to sleep.

*Sleep as a Major Life Activity*

Every circuit to have addressed the question has held that sleeping qualifies as a major life activity. *See, e.g.*, *Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006); *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352-53 (4th Cir. 2001); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998). At oral argument, the government all but conceded the issue. *See* Oral Arg. at 17:55. Nonetheless, we feel compelled to address this question in some detail because we expressly left it open in *Haynes v. Williams*, 392 F.3d at 482 & n.3, where one of our colleagues—in a thought-provoking concurrence—"question[ed] the premise . . . that 'sleeping' is 'a major life activit[y],'" *id.* at 485 (Williams, J., concurring) (second alteration in original). Finding the issue now squarely before us and following the Supreme Court's instruction that the phrase "'[m]ajor life activities' . . . refers to those activities that are of central importance to daily life," *Toyota*, 534 U.S. at 197, we hold that sleeping indeed qualifies as a "major life activity" for purposes of the Rehabilitation Act.

We begin with the statute's text. In the most basic sense of the word, sleeping certainly qualifies as an "activity," i.e., "a process (as moving or digesting) that an organism carries on or participates in by virtue of being alive." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 22 (1993). And as for the word "major," the Supreme Court has explained that the word's plain meaning "denotes comparative importance and suggests that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998) (citations and

internal quotation marks omitted); *see also Toyota*, 534 U.S. at 197 ("'Major' in the phrase 'major life activities' means important."). Sleeping is unquestionably a significant activity—human beings spend roughly a third of their lives doing it. And it is certainly important. Though the *Haynes* concurrence suggested that sleep is "largely an instrumental activity . . . valued for its ability to refresh us for various waking activities," *Haynes*, 392 F.3d at 485 (Williams, J., concurring), after sleeping on the matter, we are convinced that sleep is a vital life activity in its own right. Indeed, like human reproduction, which the Supreme Court labeled a major life activity in *Bragdon v. Abbott*, sleep is "central to the life process itself." 524 U.S. at 638.

According to the National Institutes of Health, sleep amounts to more than "down time"—it is a period when the "brain is hard at work forming the pathways necessary for learning and creating memories and new insights." NAT'L INSTS. OF HEALTH, U.S. DEP'T OF HEALTH & HUMAN SERVS., YOUR GUIDE TO HEALTHY SLEEP 1 (2005). Although researchers continue to uncover its benefits, sleep is believed to play a role in brain development, memory reinforcement, and immune function. *See* Wynne Chen & Clete A. Kushida, *Perspectives*, *in* SLEEP DEPRIVATION: BASIC SCIENCE, PHYSIOLOGY AND BEHAVIOR 1, 11-22 (Clete A. Kushida ed., 2005); *see also* CARLOS H. SCHENCK, SLEEP: THE MYSTERIES, THE PROBLEMS, AND THE SOLUTIONS 1-2 (2007) ("While it may look like nothing much is happening while a person is sleeping, there's actually a complicated chain of events going on in the brain, and that chain is vital to our overall health."). One medical textbook explains that "there is a growing consensus that sleep serves a function of offline memory processing," noting that "[s]leep has been shown to enhance prior learning of perceptual and motor skills, paired word associates, and emotionally charged episodic memories, and

even to enhance mathematical insight." Robert Stickgold, *Why We Dream*, *in* PRINCIPLES AND PRACTICE OF SLEEP MEDICINE 579, 579 (Meir H. Kryger et al. eds., 4th ed. 2005) (footnotes omitted). Moreover, even if one considered sleeping merely an "instrumental activity," *Haynes*, 392 F.3d at 485 (Williams, J., concurring), many other biological activities—such as eating or breathing—could be similarly characterized, yet courts have held that they nonetheless qualify as major life activities under the statute. *See, e.g.*, *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003) (recognizing eating as a major life activity); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) (eating); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424 (8th Cir. 1999) (breathing and eating); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir. 1996) (breathing).

The *Haynes* concurrence also wondered whether sleep could be a major life activity given that "humans' sleep needs vary radically," *Haynes*, 392 F.3d at 485 (Williams, J., concurring), but the same could be said of several other major life activities. For instance, some people choose never to procreate, yet the *Bragdon* Court had "little difficulty" concluding that reproduction nonetheless constitutes a major life activity under the ADA. 542 U.S. at 638. And although we have no occasion to hold that eating constitutes a major life activity, we note that individual food intake needs vary drastically—some get by on very little while others require three squares a day (or more)—yet it would seem odd to conclude that eating is not a major life activity on that basis. Indeed, no court has ever so held.

Our conclusion that sleep qualifies as a major life activity finds support in federal regulations interpreting the Rehabilitation Act and the ADA. *Cf. Toyota*, 534 U.S. at 194 (assuming without deciding that EEOC regulations are

reasonable and declining to decide what deference, if any, they are due).  Those regulations explain that "[m]ajor life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  45 C.F.R. § 84.3(j)(2)(ii); *see also* 29 C.F.R. § 1630.2(i).  Although the list makes no reference to sleeping, it "is illustrative, not exhaustive," *Bragdon*, 524 U.S. at 639, and sleeping, like "walking, seeing, hearing, speaking, [and] breathing," is "a basic activity that the average person in the general population can perform with little or no difficulty," *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999).  Indeed, sleep is more "central to the life process itself," *Bragdon*, 524 U.S. at 638, than some of the other activities listed, such as seeing, hearing, and speaking, for one can survive without engaging in these activities, but not without sleeping.

In sum, sleep "falls well within the phrase 'major life activity.'"  *Id.* (discussing human reproduction).  One scientific text explains it in terms of evolutionary biology:

> It is clear that sleep has an important physiologic function, given its widespread presence in the animal kingdom, and its persistence among species despite the attendant risks taken during such recurrent periods of reduced awareness, which is characteristic of the sleep state.  Molecular and behavioral conservation indicate that sleep likely conferred a selective advantage in ancestral mammals, and sleep deprivation experiments in animals have clearly shown that sleep is required for survival.

Chen & Kushida, *supra*, at 3.  Or, put somewhat more eloquently:

Sleep that knits up the ravell'd sleave of care,
The death of each day's life, sore labour's bath,
Balm of hurt minds, great nature's second course,
Chief nourisher in life's feast,—

WILLIAM SHAKESPEARE, MACBETH act 2, sc. 2.

### *Substantial Limitation*

Having thus concluded that sleeping is a major life activity, we ask whether Desmond has presented enough evidence to persuade a reasonable jury that his PTSD substantially limited his ability to sleep.  The district court concluded that he failed in this task, a decision we review de novo.  *See Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007).  As an initial matter, we note that the government agrees that PTSD can cause sleeplessness, and at no point has it contested Desmond's assertion that his PTSD caused his sleep problems.  *Cf.* Murray B. Stein & Thomas A. Mellman, *Anxiety Disorders*, *in* PRINCIPLES AND PRACTICE OF SLEEP MEDICINE*, supra*, at 1297, 1305 ("Sleep complaints are myriad and often severe in patients with PTSD.").  Thus, the question is whether Desmond has produced enough evidence to allow a reasonable jury to conclude that his PTSD-related sleeplessness was "substantial."

The Supreme Court has made clear that "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Toyota*, 534 U.S. at 198 (quotation marks omitted).  The Court elaborated, "An individualized assessment of the effect of an impairment is particularly

necessary when the impairment is one whose symptoms vary widely from person to person." *Id*. at 199.

Less clear is the benchmark against which the person's experience is to be measured. Citing EEOC regulations and decisions from our sister circuits interpreting the phrase "substantially limits," we have held that plaintiffs must show that their limitation was substantial "as compared to the average person in the general population." *Singh v. George Washington Univ. Sch. of Med.*, 508 F.3d 1097, 1100-04 (D.C. Cir. 2007); *see also, e.g.*, *Pack*, 166 F.3d at 1306 (citing 29 C.F.R. § 1630.2(j)(1)(ii)); *Colwell*, 158 F.3d at 644 (same). Because "humans' sleep needs vary radically," *Haynes*, 392 F.3d at 485 (Williams, J., concurring), and because needing a great deal of sleep may be as debilitating as getting too little, it may be more appropriate in some situations to set the benchmark against the individual's experience prior to becoming impaired, or perhaps upon some combination of the individual's and the average person's experience. But we need not resolve that issue because, as we explain below, Desmond alleged facts sufficient to show his ability to sleep was substantially limited as measured against either an individualized or a generalized benchmark.

In determining whether a limitation is substantial, courts must take into account any mitigating or corrective measures, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999), and may consider three factors: "(1) [t]he nature and severity of the impairment; (2) [t]he duration or expected duration of the impairment; and (3) [t]he permanent long term impact, or the expected permanent or long term impact of or resulting from the impairment," 29 C.F.R. § 1630.2(j)(2); *see Toyota*, 534 U.S. at 198 (stating an "impairment's impact must . . . be permanent or long term"). Plaintiffs must therefore offer more than generalized allegations of restless or fitful sleep, or

occasional, temporary bouts of sleeplessness. *See, e.g.*, *Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004) (holding that plaintiffs claiming they could not "sleep normally" or get "a solid night's sleep" failed to show a substantial limitation); *Colwell*, 158 F.3d at 644 (holding that a plaintiff who stated he "usually get[s] a tough night's sleep" was not substantially limited in sleeping).

Desmond has met this standard. Viewed in the light most favorable to him, Desmond's evidence shows that he suffered from longstanding sleeplessness dating back to the 1997 burglary incident in Cleveland, the problem became progressively worse over time, and his sleeplessness continued even when he returned home to Cleveland on leave during training. In his uncontroverted declaration, Desmond detailed the severity and duration of his sleeplessness in the following terms: "Prior to the issuance of orders, I was sleeping an average of three to five hours per night. Once orders were issued, I began to sleep only two to four hours each night. Until I returned to Ohio on a permanent basis, I was unable to sleep more than four hours each night, and frequently received only two or three hours of sleep." Desmond Decl. ¶ 48. And Desmond further testified that after leaving the Academy permanently he received approximately six hours of sleep per night, i.e., one-third to two-thirds more sleep than the two to four hours per night he was getting for the five months he remained at the Academy after receiving his orders. *See* Desmond Dep. 297. Although he offered no medical or expert testimony chronicling his sleeplessness, "a plaintiff's personal testimony cannot be inadequate to raise a genuine issue regarding his own experience." *Haynes*, 392 F.3d at 482. As for the comparison to "the average person in the general population," 29 C.F.R. § 1630.2(j)(1), in his opposition to the government's motion for summary judgment, Desmond pointed to a study showing that

seventy-one percent of adults get five to eight hours of sleep per night. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. 34; *cf. Harding v. Cianbro Corp.*, 436 F. Supp. 2d 153, 175-76 (D. Me. 2006) (discussing same study's finding that "only 8% of persons surveyed slept less than five hours on weeknights and 6% slept less than five hours on weekend nights"). For its part, the government offers no contradictory evidence.

The district court nonetheless concluded that two to four hours of sleep per night for five months "does not on its face necessarily qualify as a substantial limitation on the ability to sleep." Mem. Op. at 32. But whether Desmond's sleeplessness "*necessarily* qualif[ies]" as a substantial limitation is beside the point on summary judgment. *Id.* (emphasis added). At this stage, the only question is what a reasonable jury could conclude. *See Haynes*, 392 F.3d at 485 (affirming district court's grant of summary judgment to employer because plaintiff's "evidence would not have permitted a reasonable jury to conclude that [he] was substantially limited in a major life activity"). Without expressing our own views on the issue, we believe that Desmond's evidence suffices to allow a jury to conclude that receiving two to four hours of sleep per night for five months constitutes a significant restriction on the ability to sleep as compared with both his own ordinary experience and with the average experience of the general public, and hence a substantial limitation under the Rehabilitation Act. To be sure, sleeping deficiencies are widespread, and a jury may well decide that Desmond's sleep difficulties amounted to nothing more than those commonly experienced. But that's a factual question—one forming the core of Desmond's case— and Desmond has produced sufficient evidence to preclude summary judgment against him on that issue. That courts have reached conflicting conclusions in the face of similar claims reinforces our belief that borderline cases like this turn

on fact questions best left to juries rather than to judges ruling on summary judgment. *Compare Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1060 (9th Cir. 2005) (holding that a plaintiff claiming to get "five or six hours a night" for "months" had produced "sufficient evidence to preclude summary judgment"), *with Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316-17 (6th Cir. 2001) (holding that inability to sleep more than four to five hours per night did not demonstrate a substantial limitation in the major life activity of sleeping as compared to the average person's ability to sleep).

In support of its contrary holding, the district court distinguished EEOC enforcement guidance setting forth what constitutes a substantial limitation in sleeping. Although the guidance "does not carry the force of law and is not entitled to any special deference," *Pack*, 166 F.3d at 1305 n.5, like the district court we think it relevant to the question before us. The guidance includes the following discussion:

> An impairment substantially limits an individual's ability to sleep if, due to the impairment, his/her sleep is significantly restricted as compared to the average person in the general population. These limitations must be long-term or potentially long-term as opposed to temporary to justify a finding of ADA disability.
>
> *For example, an individual who sleeps only a negligible amount . . . for many months, due to post-traumatic stress disorder, would be significantly restricted as compared to the average person in the general population and therefore would be substantially limited in sleeping. Similarly, an individual who for*

*several months typically slept about two to three hours per night . . . due to depression, also would be substantially limited in sleeping.*

*By contrast, an individual would not be substantially limited in sleeping if s/he had some trouble getting to sleep or sometimes slept fitfully because of a mental impairment. Although this individual may be slightly restricted in sleeping, s/he is not significantly restricted as compared to the average person in the general population.*

EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities add. ¶ 11 (2000) (emphasis added) (footnotes omitted), *available at* http://www.eeoc.gov/policy/docs/psych.html. Faced with this language, the district court drew a distinction between "negligible amount[s]" of sleep and "two to three hours per night," reasoning that individuals suffering from PTSD must show they receive only a "negligible amount," which must be less than the "two to three hours per night" deemed a sufficient showing for individuals suffering from depression. *See* Mem. Op. at 35. But we see no reason why a lack of sleep caused by PTSD would require a stronger showing than a lack of sleep caused by depression. As we read the guidance, the EEOC's specific reference to "two to three hours" sheds light on the more general reference to a "negligible amount" of sleep, a reading confirmed by the EEOC's use of the word "[s]imilarly" when comparing the two impairments. *Id.* The guidance also makes clear that the relevant time frame for determining a substantial limitation in sleep is measured in months, not years. We thus agree with Desmond that to the extent the EEOC enforcement guidance is relevant, it supports his position that a reasonable jury

could conclude that an individual whose impairment causes him to sleep only two to four hours per night for five months is substantially limited in the major life activity of sleeping.

The government's arguments to the contrary are unpersuasive. In its brief, the government contends that Desmond's alleged sleeplessness could not possibly amount to a substantial limitation because, in the government's view, it had no discernable effect on Desmond's performance at the Academy or on his work life in general. Thus, according to the government, because Desmond himself admitted that he "was still performing at a high level despite . . . the sleeplessness," Desmond Dep. 298, Desmond's PTSD fails as a matter of law to qualify as a substantially limiting impairment. At oral argument, however, government counsel seemed to reformulate this argument, suggesting that to claim the Act's protection a plaintiff alleging a substantial limitation in sleeping must show some effect on his waking activities. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007) (finding evidence insufficient to preclude summary judgment when the plaintiff's allegations were "unenhanced by claims that [a] lack of sleep affect[ed] her daytime functions"); *Haynes*, 392 F.3d at 486 (Williams, J., concurring) (suggesting that "the only way to answer the question whether the impairment substantially limit[s] [a plaintiff]'s sleep would be by reference to the effects on his waking life activities" (internal quotation marks omitted)). Desmond disagrees, arguing that he "need not demonstrate that his sleep impairment affects his ability to work or to do anything else other than sleep, just as a deaf individual need not demonstrate that his impairment affects his ability to work or do anything other than hear in order to be considered disabled." Appellant's Opening Br. 20 n.3. We agree with Desmond that the government reads more into the statute than Congress put there.

As the Supreme Court observed in *Bragdon*, Congress did not "intend[] the ADA only to cover those aspects of a person's life which have a public, economic, or daily character." 524 U.S. at 638. Indeed, nothing in the statute suggests that to claim the Act's protection a plaintiff like Desmond must demonstrate that his impairment affects his work performance in some way or has an ancillary effect on his waking life in general. Rather, to qualify as disabled under the first part of the statute's disability definition, the Act requires only that a plaintiff show that he suffers from an impairment that substantially limits him in a major life activity. Here, Desmond alleges that his PTSD substantially limits his ability to sleep and has provided enough evidence to allow a reasonable jury to agree. But the government demands more—it wants Desmond to show that his alleged impairment limits *other life activities* as well. At oral argument, for example, government counsel suggested that Desmond's case would have proved more compelling if he could have shown that his sleeplessness caused him to "fall asleep when . . . trying to eat so [he] can't eat a proper meal," Oral Arg. at 19:40-:52, or had a negative "effect on [his] work life," *id.* at 18:10-:35. But Desmond has alleged no limitation on eating or working. The only major life activity he claims his PTSD limits substantially is sleeping, and neither the statute nor the regulations interpreting it include any indication that the major life activity of sleeping is substantially limited only if some other life activity is also limited.

The following hypothetical demonstrates the flaw in the government's interpretation of the Act. Suppose an individual uses a wheelchair but performs her desk job perfectly and without needing an accommodation of any sort. Now imagine the employee's new manager finds having her in the office depressing and a drain on morale. The manager

concocts a performance-related reason for terminating the employee and fires her. Were the government correct that plaintiffs must show the alleged impairment has some effect on work, that individual would have no cause of action under the Rehabilitation Act. True, she may be substantially limited in the major life activity of walking, but the impairment has no effect at all on her work life. For obvious reasons, leaving such a plaintiff without a remedy would run completely counter to Congress's aim of protecting disabled individuals from employment discrimination.

To be sure, the alleged limitation's effect in the workplace may become relevant if the employee requests a reasonable accommodation. *See, e.g.*, *Squibb*, 497 F.3d at 785 ("[T]o the extent an ADA discrimination claim centers on a request for a workplace accommodation, there must be some causal connection between the major life activity that is limited and the accommodation sought."); *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005) (explaining that unlike in discrimination cases where plaintiffs seek "equal treatment in public accommodations," when plaintiffs seek workplace accommodations, the "accommodation must be related to the limitation that rendered the person disabled"). For example, if the hypothetical wheelchair-user needed access to an upstairs restroom, the statute would require the court to determine whether such an accommodation was reasonable. *See Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993) (explaining that the Rehabilitation Act requires the government to "take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result"). But Desmond requested no accommodation. Rather, he alleges pure discrimination on the basis of a mental disability. As Desmond sees it, he was on track to graduate from the Academy, FBI officials discovered he had PTSD, his

treatment at the Academy changed immediately, and he was ultimately discharged for pretextual reasons. So long as Desmond's alleged impairment meets the statutory definition of disability, he may seek the Act's protection.

In any event, even if the government were correct that Desmond must show some negative effect on his waking life to satisfy the Act's substantial limitation requirement, the record demonstrates that he has done so. Desmond asserts that because of his "severe difficulties sleeping while at the Academy [he] was often extremely tired during the day" and therefore unable "to participate in social activities in the evening." Desmond Decl. ¶ 50. As Desmond further explains, "the fatigue from which I suffered, and my generally quiet nature, made me more reserved and introspective than I would have been otherwise" and "as the symptoms of my PTSD grew worse, including the sleeplessness, I was often tired and less apt to socialize." *Id.* ¶¶ 50, 137. This factual assertion takes on particular significance in the context of this case because one of the FBI's professed reasons for Desmond's termination was his alleged sulking manner and unwillingness to socialize with his peers. For example, Cochran's memorandum to Higginbotham reported that classmates called Desmond a "sad sack," "droopy," and "quiet and depressed," noting his tendency to "sit[] alone" while his classmates gathered elsewhere. *See* Memorandum from James Cochran to Jeffrey Higginbotham 5, 7. In deposition testimony, Cochran admitted to "serious concerns" with Desmond's "emotional maturity . . . in terms of his withdrawn nature." Cochran Dep. 231. Similarly, Higginbotham testified that he understood Desmond to be "a sad to despondent, somewhat withdrawn person," Higginbotham Dep. 50, and Higginbotham's memorandum to FBI headquarters stated that Desmond "chose to separate himself from the social environment and

support of his class." Memorandum from Jeffrey Higginbotham to William Welby 5. According to Desmond, this social withdrawal was directly tied to his PTSD-related sleeplessness. Asked during his deposition how PTSD affected him during training, Desmond replied, "according to Mr. Cochran and everyone else it manifested its[elf] . . . by my withdrawal from everyone, and I can't say I disagree." Desmond Dep. 301. Thus, even if sleep should be analyzed differently from other major life activities—and the statute gives us no reason to think that it should—Desmond has alleged that his sleeplessness had a meaningful effect on his waking life, one that the FBI cited as a reason to dismiss him.

Next, the government argues that Desmond's alleged sleeping problems cannot amount to a substantial limitation because they were tied to a specific geographic location. This argument rests on Desmond's statement that, "[*u*]*ntil I returned to Ohio on a permanent basis*, I was unable to sleep more than four hours each night, and frequently received only two or three hours of sleep." Desmond Decl. ¶ 48 (emphasis added). As the government sees it, Desmond's sleeplessness abated when he returned home to Ohio, rendering it merely a temporary problem rather than a substantial limitation. For support, the government relies on *Haynes*, an ADA case in which we held that "[i]f the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term." *Haynes*, 392 F.3d at 483.

*Haynes* differs from this case. To begin with, here the record includes evidence that Desmond's sleep problems persisted even when he was on leave from training in Ohio. *See* Sarah Desmond Decl. ¶ 8. And in any event, *Haynes* involved an employee whose alleged impairment, idiopathic pruritus, caused extreme itching that limited his ability to

sleep, and some allergen inside the plaintiff's office building triggered the symptoms. 392 F.3d at 480. We held that Haynes was not substantially limited in sleeping, explaining that he "could have avoided the itching that seriously affected his sleep simply by working at a different location." *Id.* at 483. "[W]ere we to hold that a plaintiff can recover under the ADA based on a condition that becomes limiting only when he works in a single building," we reasoned, "we would transform the ADA into an occupational safety and health statute." *Id.* Desmond's alleged sleeplessness has little in common with Haynes's, whose "inability to sleep derived from his reaction to the building in which he worked." *Id.* at 484. According to Desmond's affidavit, his sleeplessness began in Ohio after the 1997 burglary, followed him to Quantico, Virginia, and remained with him even while on leave in Ohio. Although it's possible Desmond could have ameliorated his PTSD-induced sleeplessness by quitting the Academy and moving back to Ohio, in *Haynes* we expressly distinguished *EEOC v. United Parcel Service, Inc.*, 249 F.3d 557 (6th Cir. 2001) ("*UPS*"), where the plaintiff "could have obtained relief" from his symptoms "by moving out of the geographic area in which he lived." *Haynes*, 392 F.3d at 483 (discussing *UPS*, 249 F.3d at 562-63). Desmond's alleged impairment has more in common with *UPS*, in which the court found a substantial limitation, than it does with *Haynes*, where we found no actionable disability.

## *"Regarded as" Claims*

We turn briefly to Desmond's claims that the FBI "regarded" him as having a substantial limitation in a major life activity, rendering him disabled under the Act's third disability definition. *See* 29 U.S.C. § 705(20)(B)(iii). Desmond argues that the FBI regarded him as substantially limited in his ability to work and to interact with others. This circuit has yet to decide whether either of these activities

qualifies as a major life activity for purposes of the Rehabilitation Act or the ADA. *See Gasser v. District of Columbia*, 442 F.3d 758, 763 n.7 (D.C. Cir. 2006) (assuming, without deciding, that "working" constitutes a major life activity). But assuming for the purposes of argument that they do so qualify, we affirm the district court's conclusions that Desmond failed to present sufficient evidence that the FBI regarded him as substantially limited in either of them.

First, "to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999) (assuming arguendo that working qualifies as a major life activity); *see also Sutton*, 527 U.S. at 492 (making same assumption and holding that "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice"). Here the district court correctly concluded that Desmond presented "no evidence that the FBI considered [him] to be unsuitable for any position other than FBI Special Agent, which is a specific position rather than a class or broad range of jobs." Mem. Op. at 40. Indeed, Varnum's letter dismissing Desmond from the FBI Academy concluded: "Most important, your superiors and I are concerned about your safety and ability to deal with difficult and potentially dangerous situations that you will confront *as an Agent in the field*." Letter from Michael Varnum to Martin Desmond 2-3 (Nov. 6, 2000) (emphasis added); *see also Giordano v. City of New York*, 274 F.3d 740, 749 (2d Cir. 2001) (finding summary judgment appropriate when a police officer presented "no evidence from which [the court] [could] infer that the [police department] thought, or had grounds for thinking, that other jobs in the public or private sector . . .

carry the same nature or degree of risk" as the job plaintiff had been denied).

Second, Desmond cannot meet the standard that his own brief proposes for showing a substantial limitation in one's ability to interact with others. Borrowing the standard from the Second Circuit's opinion in *Jacques v. DiMazrio, Inc.*, 386 F.3d 192 (2d Cir. 2004), Desmond suggests:

> [A] plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people—at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.

*Id.* at 203. Pointing to evidence that various FBI officials or colleagues referred to him as "depressed," "melancholy," "sulking," a "sad sack," and so on—along with passing references by FBI officials suggesting that Desmond might be a danger to himself or others—Desmond contends that the FBI regarded him as "severely limit[ed] [in] the fundamental ability to communicate with others." *Id.*

We disagree. No record evidence suggests that anyone believed Desmond was unable to "initiate contact with other people and respond to them, or . . . go among other people—

at the most basic level of these activities." *Id.* Rather, the record reveals that, if anything, Desmond's superiors simply thought his "communication [was] inappropriate, ineffective, or unsuccessful." *Id.* As for Desmond's argument that FBI officials thought he was homicidal or suicidal, we agree with the district court that no reasonable jury could find that to be the case based on the fleeting references in the record.

*Pretext*

Although Desmond failed to present sufficient evidence supporting his "regarded as" claims, he did present enough evidence to survive summary judgment under the Act's first disability definition: a reasonable jury could conclude that he had an impairment (PTSD) that substantially limited a major life activity (sleeping). Desmond acknowledges that the government has articulated legitimate, non-discriminatory reasons for his dismissal, namely, that he lacked the cooperativeness and emotional maturity required by FBI training standards. Therefore, "the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (citations and internal quotation marks omitted); *see also U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983). Accordingly, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). A plaintiff may attempt to carry this burden, as Desmond has, by presenting enough evidence to allow a reasonable trier of fact to conclude that "the employer's proffered explanation is unworthy of credence," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981), and merely a "pretext for discrimination." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

The district court found Desmond's pretext evidence insufficient, explaining that he had failed to "directly persuade the Court that Defendant was motivated by discrimination related to Plaintiff's PTSD." Mem. Op. at 47. In reaching this conclusion, the district court said that it "finds it reasonable to believe that Plaintiff's numerous transfer requests are worthy of credence as one of a number of reasons for the adverse employment actions against him" and "gives full credence to [the FBI]'s concerns regarding [Desmond]'s judgment in addition to concerns regarding his commitment to the FBI Special Agent program based on the placement of [the resignation] letter." *Id.* at 47-48.

At this stage of the litigation, however, Desmond had no obligation to "directly persuade" *the district court* that the FBI took action against him because of his PTSD—he had only to present enough evidence to allow *a reasonable jury* to so conclude. As we recently reiterated in *George v. Leavitt*, "at the summary judgment stage, a judge may not make credibility determinations, weigh the evidence, or draw inferences from the facts—these are jury functions, not those of a judge ruling on a motion for summary judgment." 407 F.3d 405, 413 (D.C. Cir. 2005).

*George*, a Title VII case, provides particularly useful guidance. There, an African American employee complained of race discrimination by EPA officials, and as here, the agency claimed she was fired for "conduct and performance deficiencies." *Id.* at 414. We held that by "vigorously disput[ing] the validity of the reasons cited by EPA," the plaintiff had "creat[ed] a genuine dispute over these material facts" and had "proffered ample evidence by which a reasonable jury could conclude that EPA's stated reasons [we]re 'unworthy of credence.'" *Id.* at 413 (quoting *Burdine*, 450 U.S. at 256).

So too here.  Desmond "vigorously disputes the validity of the reasons cited by [the FBI]" for his dismissal.  *Id.*  For example, Varnum's dismissal letter accused Desmond of displaying a lax work ethic while serving as a switchboard operator, citing instances where he left his post for lengthy periods, played computer solitaire, and engaged in private conversations.  Desmond offers evidence explaining each of the incidents underlying this allegation, stating that he left his post only once—with Trott's express permission—to meet with Dr. Davis, played computer games only when allowed to do so due to low call volume, and always answered calls promptly.  Desmond Decl. ¶ 126.  Varnum's letter also stated that Desmond failed to handle his Chicago assignment maturely, pointing out that he "contacted the Transfer Unit, FBI HQ, and Academy staff repeatedly in an attempt to have [his] transfer orders amended and [was] advised each time that [his] assignment to the Chicago division would not be changed."  Letter from Michael E. Varnum to Martin P. Desmond 2.  Again, Desmond has a perfectly plausible response.  He says he was on friendly terms with the transfer unit officer, John Jacobs, and sent him a few informal emails checking on various ways to secure a transfer to Cleveland.  Record evidence supports Desmond's account, *see* Jacobs Dep. 37-38, and indeed, no FBI official ever told Desmond that his attempts at arranging a Cleveland transfer were either inappropriate or violated FBI protocol, *see* Cochran Dep. 32-33, 107.  Finally, the FBI placed great weight on the incident involving Desmond's putative "resignation letter."  But Desmond insists that, following his EAP counselor's advice, he wrote this letter in a therapeutic attempt to vent his emotions and consistently reaffirmed his commitment to the FBI.  Given Desmond's explanations, whether the FBI's reasons for dismissing him are unworthy of credence is for a jury to determine.

Of course, "a plaintiff who creates a genuine issue of material fact as to whether the employer has given the real reason for its employment decision will [not] *always* be deemed to have presented enough evidence to survive summary judgment." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc). Indeed, "there will be instances where . . . the plaintiff has . . . set forth sufficient evidence to reject the defendant's explanation, [yet] no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. For example, it will not do for the plaintiff to show that the employer's stated reason was false if the employer believed it in good faith; the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

This, however, is not such a case. Read in Desmond's favor, the evidence supports his claim that FBI officials began treating him in a markedly different manner only after learning of his PTSD diagnosis. Furthermore, as in *George* the record includes evidence that Desmond performed well at the FBI and was respected by many of his peers. *See George*, 407 F.3d at 414. One classmate extolled Desmond as "one of the most capable individuals in our class," adding "never . . . did I feel that he had a poor attitude toward the job or that it would be inappropriate for [him] to be in a law enforcement position." Email from William B. Shute to Jeffrey Higginbotham (Oct. 4, 2000). Another classmate called Desmond a "team player" and said that she "wouldn't think twice about going through a door with him." Email from Kera E. Wulbert to Jeffrey Higginbotham (Oct. 4, 2000). Moreover, like the plaintiff in *George*, Desmond's mid-course interview—which took place after he received his Chicago assignment—revealed not a single problem or

complaint about his behavior or performance. *See George*, 407 F.3d at 414.

In addition, Desmond points to evidence from which a jury could infer discriminatory motivation on the part of the FBI. According to Dr. Davis, Higginbotham harbored concerns that "Desmond continued to suffer from some sort of psychological impairment[] that would affect his abilities going forward" as a special agent. Davis Dep. 144. And even though Dr. Davis told Higginbotham that she believed Desmond was experiencing symptoms related to trauma and that a certain treatment technique could reduce those symptoms—information Higginbotham says he granted "substantial weight"—Higginbotham nonetheless declined to pass this information on to his superiors even though he knew his memorandum recommending Desmond's dismissal was "still pending at FBI headquarters" and that he "ha[d] the prerogative to call up and say I've changed my mind." Higginbotham Dep. 210, 213. In sum, as in *George*, "[t]here is nothing to indicate that [Desmond]'s assessment is either incredible or fanciful. Indeed, [his] performance evaluation and some of the statements from other employees support [him]. Therefore, there is a genuine issue as to [his] performance and conduct." 407 F.3d at 414.

We can easily dispose of the government's arguments to the contrary. In its brief defense of the district court's pretext holding, the government maintains that Desmond's characterizations of the FBI's reasons for his dismissal are "self-serving." Appellees' Br. 32. That may be, but as *George* points out, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *George*, 407 F.3d at 414 (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990)). Next,

echoing the district court, the government contends that Desmond's explanations are "unpersuasive." Appellees' Br. 32. That too may be, but that's for a jury to decide. As in *George*, "[a]lthough a jury may ultimately decide to credit the version of the events described by [the FBI] over that offered by [Desmond], this is not a basis upon which a court may rest in granting a motion for summary judgment." 407 F.3d at 413. Accordingly, because Desmond presented enough evidence to persuade a reasonable trier of fact that the FBI's proffered reasons for his dismissal were pretextual, we reverse the district court's grant of summary judgment to the FBI on Desmond's disability discrimination claim.

## III.

We turn finally to Desmond's retaliation claim. As recounted above, Desmond alleged that Higginbotham said he would have let Desmond graduate had Desmond not filed an EEO complaint. Higginbotham denied saying any such thing, creating the factual dispute that allowed the retaliation claim to proceed to a jury. At trial, Higginbotham admitted that he declined to send up the chain of command the additional supportive emails Desmond had solicited, or to include a reference to Dr. Davis's support for Desmond's graduation. *See* Trial Tr. at 817, 848-50 (Feb. 22, 2007). And Deputy Administrator Michael Varnum, who relied entirely on the materials sent to him when deciding Desmond's fate, later testified that "any information, whether it came from Dr. Davis or someone else, I would have wanted to see." Trial Tr. at 1131 (Feb. 26, 2007). Desmond argued that Higginbotham's omissions were retaliatory in nature and could well have doomed his chances of salvaging his career as a special agent. The jury, however, thought otherwise and found for the FBI.

Desmond now challenges two district court rulings. First, he claims that the district court improperly admitted into evidence the "Cochran report," the 112-page document Cochran compiled during his suitability inquiry chronicling Desmond's alleged failures, infractions, and indiscretions at the Academy. According to Desmond, the Cochran report had no probative value, yet risked biasing the jury against him by providing a catalogue of his supposed inadequacies as an FBI trainee, rendering it inadmissible under Federal Rule of Evidence 403. *See* FED. R. EVID. 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."). For its part, the government maintains that the district court's "attentiveness to the context in which it admitted the Cochran Report and its repeated instructions to the jury concerning how it was to be considered were amply within the District Court's discretion and free of legal error." Appellees' Br. 34. Reviewing the district court's evidentiary ruling for abuse of discretion, *United States v. Lawson*, 494 F.3d 1046, 1052 (D.C. Cir. 2007), we agree with the government.

To begin with, the report's probative value is obvious: it shows what information Higginbotham had before him when he made his initial decision regarding Desmond. Desmond's retaliation claim turns on the allegation that Higginbotham received enough positive information about Desmond's performance and character that he would have changed his mind, let Desmond graduate, and withdrawn his recommendation of dismissal—if only Desmond had never filed an EEO complaint. Thus, to decide whether Higginbotham had retaliated against Desmond, the jury had to compare the information Higginbotham had before him when he made his decision with what he received later. Or, as defense counsel put it during a pretrial conference, the jury

would need to be able to decide if it was "reasonable to believe that [Higginbotham] would have discounted the Cochran Report based on the information that came in." Pretrial Conf. Tr. at 23 (Nov. 16, 2006).

As for the risk of unfair prejudice, the district court recognized the possible dangers inherent in presenting the jury with a wide-ranging compilation of Desmond's foibles at the Academy. After hearing argument from counsel on the issue over the course of two lengthy pretrial conferences, the district court carefully structured the report's admission to minimize any risks. First, it refused to admit the report for the truth of its substance, ruling instead that it was "only offered to show what information Mr. Higginbotham had and . . . relied on." Second Pretrial Conf. Tr. at 141 (Feb. 6, 2007). Second, seeking to avoid mini-trials over every incident leading up to Desmond's eventual dismissal, the district court forbade either side from bolstering or attacking anything in the report, expressly warning the government not to "get into too much detail about all of the individual events," and cautioning that if it "cross[ed] the line, then it may open the door" to rebuttal evidence. Pretrial Conf. Tr. at 24-25. Third, the district court repeatedly admonished the jury to consider the report solely for the limited purpose of showing Higginbotham's reliance, instructing: "You're not to speculate about whether the report is true or not. You should consider the report by Mr. Cochran only for the fact that Mr. Higginbotham received it and relied on it in drafting his own report which he sent forward to headquarters." Trial Tr. at 910 (Feb. 23, 2007). Thus, the district court skillfully kept the trial—and the jury—focused on events occurring after Desmond filed his EEO complaint, striking a balance between providing the jury with the information it needed and protecting Desmond from the risk of unfair prejudice. This approach was sensible and well within the district court's

discretion. *Cf. United States v. DeLoach*, 654 F.2d 763, 770 (D.C. Cir. 1980) (finding no abuse of discretion where, "[a]lthough the possibility of unfair prejudice was real, . . . the district court made its decision to admit after argument . . . and gave the jury a proper limiting instruction").

Desmond's second challenge concerns the jury instructions and verdict form, which was structured as a general verdict with interrogatories. The form first asked the jury to state whether it found "that Defendant intentionally retaliated against Martin Desmond." If and only if the jury answered that question "yes" was the jury to answer two specific questions designed to elicit the basis of its finding.

Desmond asked the district court to pose to the jury a separate interrogatory for each of five distinct adverse employment actions, any or all of which could have reflected unlawful retaliatory animus: (1) Higginbotham's decision to forward to FBI headquarters his September 28 report recommending Desmond's termination, even though Higginbotham had received contrary information regarding Desmond's suitability; (2) Higginbotham's failure to transmit to headquarters the pro-Desmond evidence he had received, when that evidence may have altered Varnum's ultimate decision; (3) Higginbotham's refusal to withdraw his report after receiving Desmond's contrary evidence, which, according to Higginbotham's testimony, probably would have led to the matter being dropped; (4) Higginbotham's decision to forbid Desmond from graduating; and (5) the FBI's ultimate decision to dismiss Desmond from the special agent program. The district court held that because only the last two actions qualified as "materially adverse," only they would be included on the verdict form. Order, *Desmond v. Gonzales*, No. 03-1729 (D.D.C. Feb. 28, 2007). The first three proposed actions, the court reasoned, "may demonstrate

retaliatory animus or be used by Plaintiff to demonstrate causality, but are not materially adverse actions in and of themselves." *Id.* at 2. Challenging this ruling, Desmond argues that under *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), which defines "materially adverse" employment actions as actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 2415 (citation omitted), all five of his proposed adverse actions should have been offered to the jury and included on the verdict form.

We need not decide whether the district court erred in crafting the interrogatories on the verdict form, for any error would have been harmless. *See* FED. R. CIV. P. 61; *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 559 (D.C. Cir. 1993) (applying harmless error rule to challenges over jury instructions). The district court instructed the jury that "[a]n action is an adverse action if it is harmful to the point that it could have dissuaded a reasonable employee from making or filing a charge of discrimination." Trial Tr. at 1808 (Mar. 1, 2007). The verdict form asked jurors if they found "that Defendant intentionally retaliated against Martin Desmond." Verdict Form (Mar. 2, 2007). Having heard and considered evidence relating to all aspects of Higginbotham's alleged retaliation, the jury answered that broad question in the negative. In doing so, it must have concluded that none of the underlying actions was retaliatory. We doubt that parsing the jury instructions to include every aspect of Higginbotham's alleged retaliation would have influenced the outcome one way or another, for the question as phrased subsumed each of Higginbotham's individual acts.

## IV.

Because no error affected the trial concerning Desmond's retaliation claim, we affirm the district court's judgment on

the verdict. But because Desmond presented enough evidence to allow a reasonable jury to conclude that (1) he had an impairment that substantially limited him in the major life activity of sleeping and (2) the FBI's professed reasons for dismissing him from the FBI Academy were pretexts for discrimination, we reverse the grant of summary judgment to the FBI on Desmond's disability claim and remand for further proceedings consistent with this opinion.

*So ordered.*